Gayle White MALAUTEA, as Guardian of Fati F. Malautea, and Gayle White Malautea, Individually, and Thomas A. Nash, Jr., as Co–Guardian of Fati F. Malautea, Plaintiffs,

v.

SUZUKI MOTOR CORPORATION, a Japanese corporation, and American Suzuki Motor Corporation, a California corporation, Defendants.

No. CV 490–322.

United States District Court,
S.D. Georgia,
Savannah Division.

Dec. 30, 1991.

Kenneth Lamar Royal, Royal & Vaughan, Savannah, Ga., George A. Hilbron, Detroit, Mich., James E. Butler, Jr., Robert David Cheeley, Patrick Alan Dawson, Butler, Wooten, Overby & Cheeley, Atlanta, Ga., for plaintiffs.

Joe C. Freeman, Jr., Michael J. Goldman, Freeman & Hawkins, C.B. Rogers, Rogers & Hardin, Atlanta, Ga., Patrick J. Becherer, Crosby, Heafy, Roach & May, Oakland, Cal., Philip L. Siracuse, James D. DeRoche, Crosby, Heafy, Roach & May, Los Angeles, Cal., Gordon Allen Smith, Steven James Estep, Byron Attridge, King & Spalding, Atlanta, Ga., Gordon B. Smith, Savannah, Ga., for defendants.

## ORDER

EDENFIELD, Chief Judge.

On Friday, December 13, 1991, this Court held a hearing to determine whether to impose sanctions on the parties and their counsel for discovery abuses. After careful consideration of the evidence submitted at that hearing and the record of this case, the Court has decided to sanction the Defendants, Suzuki Motor Corporation ("Suzuki" or "SMC") and American Suzuki Motor Corporation ("American Suzuki" or "ASMC"), by striking their answers and entering judgment for the Plaintiff on the issue of liability. The Court will empanel a jury to determine the amount of compensatory damages to award the Plaintiff, and the amount of punitive damages to award, if any. The Court also has decided to impose monetary sanctions on the Defendants, defense counsel, and Plaintiff's counsel, as explained below.

## BACKGROUND

### I. *Early Discovery and the Status Conference*

The Plaintiff, Gayle White Malautea, filed this complaint on December 19, 1990.[1] Discovery began, and the Defendants stubbornly resisted the Plaintiff's attempts to obtain information from them. The Plaintiff served numerous interrogatories and requests for production of documents on the Defendants, but received few complete answers.

In a joint status report filed on July 2, 1991, the Plaintiff indicated that she would file a motion to compel based on the Defendants' responses to her first sets of interrogatories and to her first and second sets of request for production of documents. She filed the motion on July 23, the day before a routine status conference was to take place.

### A. Plaintiff's Interrogatories, Document Requests, and Motion to Compel

At the status conference, the Plaintiff showed the Court the motion to compel. Neither the Court nor defense counsel had reviewed the motion prior to the conference, so the Court asked Mr. Cheeley, one of the Plaintiff's attorneys, to summarize what the Plaintiff sought. Mr. Cheeley provided defense counsel and the Court with a written summary of the documents he sought. (Br.Supp.Mot.Compel at 6–7.) Then Mr. Cheeley explained, "We basically, Judge, are seeking the discovery that goes everything from design and testing of the vehicle to marketing of the vehicle.... What we are seeking is testing from Suzuki Motor Corporation of Japan before the vehicle was released. And we also are seeking documents dealing with certain design issues involved in the case such as body structure." (Tr. Status Conf. at 3.)

---

1. The Court recently has permitted Thomas A. Nash to be added as a Plaintiff. Because Mrs. Malautea was the only Plaintiff for most of this litigation, however, the Court will refer consistently to the Plaintiff in the singular in this Order.

Mr. Goldman, defense counsel, raised a global objection to the Plaintiff's requests because they sought information about vehicles other than the Samurai. He said the Defendants were willing, however, to waive their technical objection to revealing information about Samurai models other than the 1988½ year model, the specific model driven by Mr. Malautea during the accident. (Tr. Status Conf. at 4, 6.)

After hearing all of these arguments, the Court overruled the Defendants' objections to these questions, and added a stern warning:

> All right. What is it now? I am going to start striking answers unless it comes forward. This case has been out since [December 1990].... All discovery should have been made. It is not that complex a case. The plaintiffs tried to overblow it into a certified class. It is not going to happen. And you [indicating defense counsel] are trying to withhold information. I am not going to take it.... You produce it.

(Tr. Status Conf. at 6.) When defense counsel asked for clarification about what the Court meant by "all information," the Court replied, "All of the information he seeks on these other similar-designed products. There is no need in turning this pie and looking at it, and entertaining briefs and having a magistrate spend a great deal of time on it. You might as well produce it." *Id.*

Defense counsel reiterated his objection to producing information about automobiles other than the Samurai, and the Court responded, "Well, we will take that out at trial. If they are not the same, then they are just accumulating information they will not be able to use because I will entertain objections to it as not being similar. But if they want to look through it, let them look through it." (Tr. Status Conf. at 8.) Later, the Court emphasized to Mr. Goldman that the Court expected counsel to comply with its directives:

> In all due respect, you want me to take [the interrogatories] up, turn them over, and look at them and inspect them, and

put one down, and in the year 2001 we might have some resolution.

> I know what the end result is going to be, so there is no need of being modest about it. Approach it and get it done, and move on to something else. And there will be another Samurai overturned, and they [gesturing toward Plaintiff's counsel] will be making another million dollars out of it, and I will be here parceling out the rights. There is nothing strange about it.

> Okay. Get those documents under penalty. What else?

(Tr. Status Conf. at 24.)

### B. Discussion of Deposition Transcripts

At the status conference, the Plaintiff's attorneys also informed the Court that they sought deposition transcripts of Suzuki design engineers Toyoda and Oshima. When defense counsel stated that these depositions, taken in an earlier suit, were sealed pursuant to a Court order, the Court referred this matter to Magistrate Judge Smith. The Court indicated that the parties could appeal the Magistrate Judge's ruling on this issue.

On August 14, 1991, Magistrate Judge Smith ordered the Suzuki Defendants to give the Plaintiff a copy of these depositions. On August 20, 1991, at the request of the Defendants, Magistrate Judge Smith clarified the August 14 Order. Despite these two clear orders, the Defendants did not produce the depositions. On August 28, only a few days before the Plaintiff's counsel was scheduled to fly to Hawaii to depose the two engineers, the Plaintiff filed a motion for sanctions based on Suzuki's refusal to turn over the deposition transcripts.

### C. Tone of the Status Conference

Throughout the status conference, the Court made it absolutely clear that the Defendants were to produce the discovery sought by the Plaintiff, even if the Defendants believed the requests were overly broad. At one point the Court said, "There again, I think that is overblown, but I think it might be producible. I do order it. We will prune it out at pretrial." (Status at 11.) The tone of the conference made it clear to

all participants that the Court would not tolerate further delays:

> THE COURT: I understand the problem.... I know that I am putting the heat on. I can tell you how your stomach is churning. I have sat right where you are and listened to somebody I thought was crazy, because it cannot be done.
>
> Let me tell you, that is the only way that we overcome delay and lessen the expense is to get it done.
>
> MR. GOLDMAN: Mine is churning worse than his, Judge.

Throughout the conference, the Court asked the parties, "What else?" Finally, the parties agreed that all issues had been resolved. Thus, even though the Court did not specifically state, "I hereby expressly overrule all of the pending objections except those I am referring to the Magistrate Judge," the lawyers at the conference clearly understood that message.

## II. *Sanctions Motions and Hearing*

■ The Plaintiff's original motion, filed on August 29, 1991, sought sanctions for the Defendants' failure to produce the deposition transcripts of the Suzuki engineers, as ordered by the Magistrate Judge. Although the Defendants finally gave the Plaintiff the deposition transcripts she sought, the motion for sanctions is not moot. A party should not have to file a motion to compel followed by a motion for sanctions to obtain discoverable material from an opponent.

On September 13, 1991, the Plaintiff amended her motion for sanctions, arguing that the Defendants' answers to interrogatories and responses to requests for documents were false and misleading. In response to these motions and other filings, the Court entered an order on October 18, 1991, expressing its concern about these serious allegations and scheduling a hearing on the matter for December 13, 1991. Because the Plaintiff suggested that sanctioning the Defendant corporations rather than defense counsel would be most appropriate, the Court ordered both Defendants to send a corporate representative to the hearing.

On December 13, 1991, the sanctions hearing was held. Those present included Alan Spudd, an engineer in the legal department of American Suzuki, who appeared as American Suzuki's corporate representative. Mr. Okiyama, speaking through an interpreter, appeared as corporate representative of Suzuki. Philip L. Siracuse, national counsel for Suzuki and American Suzuki, attended, along with Patrick J. Becherer of the same law firm. Joe Freeman of Freeman & Hawkins appeared and spoke as the Defendants' Georgia counsel. Mr. Goldman of Freeman & Hawkins, who represented the Defendants at the status conference, also attended. Speaking on behalf of the Plaintiff was James E. Butler, Jr.

The Court required the Plaintiff to frame the major issues for the hearing, and then allowed each party an hour to argue or present evidence. Then, the Court asked Mr. Okiyama and Mr. Siracuse some questions under oath. Finally, the Court gave the parties an opportunity for rebuttal.

### A. The Incomplete and Evasive Answers

During the sanctions hearing, James Butler, appearing for the Plaintiff, revealed that not only have the Defendants delayed producing discovery materials, but they also have given misleading answers to interrogatories and requests for production of documents. The Defendants have avoided giving completely false answers to interrogatories; instead, they have used a number of techniques to obfuscate the truth.

Typically, the Defendants have refused to answer the Plaintiff's interrogatories on the ground that certain words and phrases were not defined. For example, the Plaintiff asked the Defendants: "Describe in detail all tests, research or other investigation within your knowledge which inform as to the risk of rollover of the Samurai, SJ410, LJ80 and Sidekick vehicles ..." (Pl.'s Inter. No. 15.) Suzuki responded:

> Defendant SMC objects to this Interrogatory as being overly broad and burdensome in that it is unlimited as to time or to the model year vehicle involved in this lawsuit. *In addition, it is vague and ambiguous in that Plaintiff has failed to define "tests, research or other investiga-*

tion," or "risk of rollover" and this Interrogatory is otherwise vague and ambiguous. Further, it seeks confidential and competitively sensitive information. However, without waiving these objections, and limited its response to the 1988½ Suzuki Samurai convertible, see ... [a list of] test reports which will be produced pursuant to a suitable protective order.

(Suzuki's Answer to Interrog. No. 15.) (emphasis added). Other terms that the Defendants found ambiguous included "change, alteration, or modification," "risk of personal injury," "substantially similar," "other sport utility vehicle," and "engineer." (Pl.'s Br. at 29, citing responses to Interrog. Nos. 8, 17, 18, 24.) To the ordinary layperson, the terms "test, research or other investigation," and "risk of rollover" are clear and unambiguous. The Defendants and their lawyers, however, have managed to inject ambiguity into these ordinary words. The Court believes that no sanction by this Court will change this aspect of the Defendants' conduct.

The Court witnessed a perfect example of this conduct at the sanctions hearing, when Mr. Freeman explained:

> The proof in this case will be that insofar as the static stability calculations that the Federal government, through NISTA, and the recognized authorities will say and testify that this is not a predictor of rollover.
>
> When we say that General Motors did not do any testing with rollover, there are tests that are done like the circle test and the S-turn, and all of those sort of things, and impact tests that in some instances will show you and be more predictive of the road stability of the vehicle. This calculation is not a test. It simply is a calculation which the Federal Government and all of the automobile companies including General Motors recognize is not a predictor of rollover.

(Tr.Hr'g at 82.) Mr. Freeman's explanation of these ordinary words is reminiscent of Humpty Dumpty's conversation with Alice:

"I don't know what you mean by 'glory,'" Alice said.

Humpty Dumpty smiled contemptuously. "Of course you don't know—till I tell you. I mean 'there's a nice knockdown argument for you.'"

"But 'glory' doesn't mean 'a nice knockdown argument,'" Alice objected.

"When I use a word," Humpty Dumpty said in rather a scornful tone, "it means just what I choose it to mean—neither more nor less."

"The question is," said Alice, "whether you can make words mean so many different things."

"The question is," said Humpty Dumpty, "which is to be master—that's all."

Lewis Carroll, Through the Looking Glass. In their attempt to "be master," the Defendants have given misinformation to the Plaintiff.

None of the words used in the Plaintiff's interrogatories are ambiguous or difficult to understand in the context of the Plaintiff's questions. The Defendants' complaints about ambiguity are part of their overall plan to obstruct the Plaintiff's discovery attempts. To the Court's disdain, these tactics are characteristic of the Defendants' actions in this case. More examples of the Defendants' bad faith approach to discovery follow.

### B. Limiting Answer to Information about 1988½ Samurai

Another technique the Defendants have used to avoid revealing the truth is to refuse to answer general questions, choosing instead to limit the question to a narrower field. The Plaintiff sought, in numerous interrogatories and requests for production of documents, information not only about the 1988½ Samurai, but also about other model years and about similar sport utility vehicles, including the SJ410, a vehicle marketed outside the United States before the Samurai, otherwise known as the SJ413, was fully developed.[2] In all of the early responses to

---

2. According to the Plaintiff, Suzuki's obfuscation campaign included a claim that the Samurai and the SJ413 are two different vehicles. The Plaintiff claims that the Defendants made this claim, despite its obvious falsity, to force the Plaintiff to jump through yet another hoop. The Court finds that the Samurai and the SJ413 are the same vehicle. A marketing brochure for the SJ413 refers to the vehicle as the "Samurai." The SJ410 is a slightly different vehicle. The SJ410

interrogatories, the Defendants steadfastly insisted that the Plaintiff was entitled only to information concerning the 1988½ model year Suzuki Samurai. Accordingly, the Defendants refused, prior to the status conference, to divulge any information about the SJ410, and any information about Samurai vehicles other than the 1988½ model Samurai. By restricting their answers in this manner, the Defendants managed to avoid revealing a great deal of discoverable information.

For example, the Plaintiff asked whether Suzuki had changed the design "of the Samurai, SJ410, LJ80, or Sidekick or any other sport utility vehicle which [Suzuki has] marketed or will market in the near future, which [Suzuki has] undertaken or considered to reduce the risk of rollover." (Interrog. No. 23.) After objecting to the vagueness of the question and the ambiguity of the term "risk of rollover," Suzuki replied that, "limiting its response to the Suzuki Samurai, Defendant SMC has not changed the design for the purpose of affecting the stability of the vehicle." (Suzuki's Response to Interrog. No. 23.) By limiting the answer in this fashion, Suzuki avoided discussing changes made to the SJ410 in designing the SJ413, and changes made to the SJ413 Samurai in designing the Suzuki Sidekick.

At the July 24 status conference, as noted above, Mr. Goldman indicated that the Defendants were willing to waive their technical objection to providing information about vehicles other than the 1988½ model vehicles. (Tr. Status Conf. 6.) The Court accepted this waiver and stated, "I am going to start striking answers unless it comes forward." *Id.* In addition, the Court ordered the Defendants to produce the requested information about similarly designed Suzuki vehicles. It appears that, after the status conference, the Defendants provided information about model years other than 1988½.[3] They also provided information about Suzuki vehicles other than the Samurai. They have never produced, however, any information about

General Motors' testing of the Suzuki vehicles or about General Motors' decision not to market a vehicle like the Samurai.

### C. General Motors

During the initial discovery stages, the Plaintiff was particularly interested in information about testing of the SJ410 by General Motors Corporation ("GM" or "GMC"). The Plaintiff's attorneys knew about the link between GM and Suzuki because they were aware that some of the information proving this link had been used by litigants in this Court to settle two cases, known as *Silverthorne* and *Burks*. The records of those cases are sealed. Therefore, to obtain information about these materials from Suzuki, the Plaintiff asked the following question:

> Describe in detail *all discussions or communications* between the defendants and GMC *concerning the design or marketing in the United States* of either a vehicle which is identical to or substantially similar to a Suzuki Samurai, *or any other sport utility vehicle*, noting in particular:
>
> (a) How and why it was decided not to market a vehicle of the same design as the Samurai, including the names of all Suzuki and General Motors Corporation employees involved in such discussions;
>
> (b) The difference between the Samurai and the vehicle (Geo Tracker) which is to be so marketed; and
>
> (c) The impact of such differences on the propensity of the vehicle to "roll over."

(Interrog. No. 18) (emphasis added). In response to this interrogatory, Suzuki stated:

> Defendant SMC objects to this Interrogatory as being overly broad, burdensome and oppressive in that it is not limited to the model vehicle involved in this lawsuit. In addition, it is vague and ambiguous in that Plaintiff has failed to define "substantially similar" or "other sport utility vehi-

---

has a 1.0 liter engine; the SJ413, a 1.3 liter engine.

**3.** The Plaintiff, citing an amended response to the Plaintiff's Request for Production of Documents No. 1, argues that the American Suzuki continued to limit answers to the 1988½ model

vehicle. After scrutinizing the entire answer, however, the Court finds that American Suzuki answered the request fully, by cross referencing their new answer to the Plaintiff's Interrogatory No. 9.

cle." However, without waiving these objections, Defendant SMC states as follows:

(1) Defendant SMC is unaware of any decision by General Motors not to market the Samurai;

(2) Defendant SMC objects to the term "which is to be so-marketed" as being vague, ambiguous, and undefined. Also, this subpart is objectionable in that it asks for a description of the differences between two totally different concepts. However, the width of the track, the wheelbase, and the weight are just some of the differences between the two vehicles; and

(3) Defendant SMC objects to the terms "impact of such differences" and "propensity to roll" as vague, ambiguous and undefined. However, without having all conditions, it is impossible to make a determination in a static or dynamic situation which vehicle is more likely to roll over. Suffice it to say, neither vehicle has a "propensity to roll", whatever that means.

(Suzuki's Resp. to Interrog. No. 18.) American Suzuki interposed similar objections to the interrogatory as vague, and stated, "ASMC had no such communications." (American Suzuki's Resp. to Interrog. No. 18.) After the status conference, American Suzuki supplemented its response to this interrogatory, stating, "There was no decision made not to market a vehicle of the same design as the Samurai." Neither Defendant ever provided any information concerning Suzuki's correspondence with GM about the Samurai.

Ultimately, the Plaintiff had to obtain the documents she sought from GM. According to information GM provided to the Plaintiff, GM tested the Suzuki SJ410 in the early 1980s to decide whether to market a similar vehicle in the United States. In a letter dated July 10, 1982, Suzuki Chairman Osamu Suzuki suggested to Roger B. Smith, who was GM's Chairman at the time, that GM market Suzuki's sport utility vehicle. (Pl.'s Ex. B–1, attached to Br.Supp.Mot. Sanctions, Sept. 18, 1991.) In this letter, Mr. Suzuki mentioned the SJ410, and suggested that the

improved model, with a 1.3 liter engine, could be marketed in the United States beginning in 1985. (*Id.* at 2.) He promised to provide information on the SJ410 and the model to be improved in the future, and asked that GM give the idea serious study, reporting to Suzuki within six months the results of the study. (*Id.* at 3.)

In response, GM asked Suzuki to supply some basic information about the SJ410. By September of 1982, Suzuki engineers had answered many of GM's basic engineering questions about the SJ410. When asked what basic engineering changes were contemplated for volume sales in the United States, Suzuki indicated, among other changes, that the engine would be increased to 1.3 liters. (Pl.'s Ex. 2, attached to Deps. of Lance, McDaniel & Uthe, at 3.) This and other evidence shows that, although GM studied and tested the SJ410, both Suzuki and GM contemplated that GM would market an improved model, later known as the SJ413 or Samurai.

Evidence clearly establishes that although General Motors considered marketing a sport utility vehicle similar to the Samurai, it decided not to do so because of safety concerns. On May 13, 1983, Robert C. Stemple, the President of Chevrolet at the time, informed Mr. Suzuki that GM had decided not to pursue the sale of the SJ410 in the United States:

Considerable test and evaluation of this vehicle [the SJ410] by our Worldwide Truck and Bus Group engineers has confirmed that major modifications would compromise vehicle design and cost.... The result of our deliberations is that both Chevrolet and the Truck and Bus Group have decided not to pursue further the sale of the current design SJ–410 through our U.S. dealers.

(Pl.'s Ex. 7, Deps. of Lance, McDaniel & Uthe, at 2.) This letter, written to Mr. Suzuki himself, establishes that Suzuki knew that GM had decided not to market the SJ410. Despite this knowledge, Suzuki told the Plaintiff that Suzuki was aware of no decision by GM not to market the Samurai.[4]

---

4. Although there are differences between the SJ410 and SJ413 (Samurai), it appears that both

GM and Suzuki used these terms loosely during these years of evaluation. Mr. Neil Douglas

After GM rejected the idea of marketing the SJ410, GM continued to correspond with Suzuki about marketing another sport utility vehicle in the United States. Yasutaro Yoshida, head of Suzuki's Office of General Motors Affairs from 1982 to 1988, testified in deposition that he often corresponded with General Motors about Suzuki's sport utility vehicles. (Yoshida Dep. at 7–8.) On April 9, 1984, Mr. T.S. McDaniel of GM wrote Mr. Yoshida: "We have continued management discussions on the SJ–413 and have reaffirmed Chevrolet's interest in marketing this vehicle ... Chevrolet's concerns are ... that previously defined engineering matters first be mutually resolved—particularly perceived rollover tendencies which have proven to be a major concern in the U.S. market...." (Pl.'s Ex. 10, attached to Deps. of Lance, McDaniel & Uthe.) Thus, it is clear that GM decided initially not to market the SJ410, or actually the improved model known as the SJ413, because of the perceived rollover problem, and that, at least by 1984, Suzuki was aware of GM's reason for this decision.

This evidence clearly establishes that, in the early 1980s, GM discussed the possibility of marketing a Suzuki sport utility vehicle in the United States, but abandoned this idea because of a perceived rollover problem. When the Plaintiff asked Suzuki to provide information about these discussions, Suzuki deliberately withheld this information. Fortunately for the Plaintiff, she was able to obtain copies of documents establishing these facts from GM.

The Court believes that Suzuki has similar documents in its files. The Court accepts that Suzuki may never have seen General Motors' internal memoranda concerning the Suzuki SJ410. Many of GM's documents, however, are letters to and from Suzuki's top executives, including Mr. Suzuki himself. Mr. Freeman argued at the sanctions hearing, "there has been no proof anywhere by anyone that these people sent these documents ... from General Motors to Suzuki."

(Tr. Hr'g at 42.) It is true that there has been no direct proof that copies of specific documents now in the Plaintiff's possession were ever received by Suzuki. The circumstantial evidence, however, is overwhelming. As Mr. Okiyama, head of Suzuki's legal department in Japan, admitted at the sanctions hearing, the top people at Suzuki must have been aware of the correspondence between the corporations. The Court simply does not find it credible that no one at Suzuki was aware of the communications between Suzuki and GM, and that no one at Suzuki was aware that GM chose not to market the SJ410, or a variation thereof, in May of 1983.

Moreover, Suzuki's national counsel was aware of these communications between Suzuki and GM at least as early as 1989. At the sanctions hearing, Mr. Siracuse testified that he learned in 1989 that GM had some documents about Suzuki vehicles. He was permitted to look at some of these documents in 1990, although he did not review them in detail. Because he "was under the impression and understanding that the GM documents were not documents which Suzuki had in its records," and because he "had confusion in understanding the scope of what was being sought by the plaintiffs," he did not reveal this information, or refer to it in any way, to the Plaintiff in response to the Plaintiff's interrogatories. (Tr.Hr'g at 58.) The Court rejects Mr. Siracuse's protestations of innocence and ignorance, and finds that he participated in the Defendants' cover up of this damaging evidence.

## D. Deposition Transcripts

The Defendants have manipulated the discovery process as part of their overall campaign to obfuscate the truth. As noted above, the Magistrate Judge issued two clear orders directing the Defendants to produce the deposition transcripts of Suzuki design engineers Toyoda and Oshima. Rather than produce them in a timely manner, the Defendants either "forgot" about compliance or

Mazza, a vice-president of American Suzuki until 1989, testified that he was informed that GM had chosen not to market the *Samurai*. (Mazza Dep. at 61.) The Court finds that Mr. Mazza was referring to GM's decision, based primarily on evaluations of the SJ 410, not to market that vehicle with the planned changes, including the plan to change the engine to a 1.3 liter engine. Whatever term is used, it is clear that GM decided not to market a Suzuki sport utility vehicle. Thus, Suzuki's answer to the interrogatory was, if not completely false, at least misleading.

purposefully waited until the last moment to comply. This delay denied the Plaintiff's counsel time for a meaningful review of the earlier depositions before conducting their own depositions. Ultimately, the Plaintiff had to file a motion for sanctions to force the Defendants to comply with the Court's orders.

In various briefs, the Defendants have argued that the Plaintiff should have telephoned defense counsel about this matter before filing the motion for sanctions. They also note that, as of August 28, 1991, they still had time to appeal the Magistrate Judge's August 20 Order. At the sanctions hearing held in December, Suzuki's Georgia counsel, Freeman, stated, "Now, the fact of the matter is that on the last day that the appeal could have been made—and frankly, Judge, we forgot about the darn thing—that is the truth of the matter. But on the day that we could have filed an appeal, it was produced by hand to them." (Tr.Hr'g, at 43.) Mr. Freeman's statement illustrates the Defendants' cavalier attitude toward this Court's discovery orders.

### III. Involvement of Jones, Osteen, Jones & Arnold

The Plaintiff's attorneys are not perfect angels. During August, the Plaintiff's attorneys, frustrated with the Defendants' delaying tactics, sought to obtain the transcripts of the Suzuki design engineers' depositions, and other information, from Jones, Osteen, Jones & Arnold, the law firm that represented the plaintiffs in the *Silverthorne/Burks* litigation. Although the Plaintiff's attorneys had never read the protective order entered in *Silverthorne/Burks*, they knew that the Court had sealed the records of that case. Despite this knowledge, the Plaintiff's attorneys sought to depose members of Jones, Osteen, Jones & Arnold. The Plaintiff's attorneys filed a subpoena duces tecum on August 20, 1991. Jones, Osteen, Jones & Arnold sought a protective order from the Court, and the Court ordered the Plaintiff's attorneys not to speak to those attorneys about this litigation. The Court indicated that it would consider imposing sanctions on the Plaintiff's attorneys for these actions.

## ANALYSIS

### I. Standards for Imposing Sanctions

In deciding whether to impose sanctions on the parties or attorneys in this case, the Court has several tools with which to work. Every court has inherent power to sanction attorneys and litigants if necessary to manage the court's affairs. In addition, a court has the authority to impose sanctions for discovery abuses under Rules 26(g) and 37 of the Federal Rules of Civil Procedure, and under 28 U.S.C. § 1927 (1988).

■ Even absent explicit legislative enactment, "deeply rooted in the common law tradition is the power of any court to 'manage its own affairs [which] necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it.'" *Carlucci v. Piper Aircraft Corp.*, 775 F.2d 1440, 1447 (11th Cir.1985) (citations omitted). Moreover, this inherent power permits a court to sanction litigants themselves. *Id.* at 1446. These inherent powers, however, "must be exercised with restraint and discretion." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980). The Supreme Court has explained, for example, that

> whether a court has power to dismiss a complaint because of noncompliance with a production order depends exclusively upon Rule 37, which addresses itself with particularity to the consequences of a failure to make discovery by listing a variety of remedies which a court may employ as well as by authorizing any order which is "just."

*Societe Internationale v. Rogers*, 357 U.S. 197, 207, 78 S.Ct. 1087, 1093, 2 L.Ed.2d 1255 (1958).

In general, Rule 37 provides authority for a court to sanction a party for abuses in the discovery process. Rule 37(b)(2) applies specifically if a party violates a court order to produce discovery:

> If a party ... fails to obey an order to provide or permit discovery, ... the court ... may make such orders in regard to the

failure as are just, and among others the following:

.        .        .        .        .

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

Fed.R.Civ.P. 37(b)(2). Rule 37(b) also permits a court, in lieu of or in addition to these enumerated sanctions, to require the sanctioned party, the party's attorney, or both, "to pay the reasonable expenses, including attorney's fees, caused by the failure." Fed. R.Civ.P. 37(b). The district court has discretion to decide what sanctions are "just." A decision to enter a default judgment, however, "ought to be the last resort—ordered only if non-compliance is due to willful or bad faith disregard of court orders." *Adolph Coors Co. v. Movement Against Racism,* 777 F.2d 1538, 1542 (11th Cir.1985). Nevertheless, there are circumstances in which these severe sanctions are necessary to deter further violations by the misbehaving party or others. As the Supreme Court has stated, "the most severe in the spectrum of sanctions provided by statute or rule must be available to the District Court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *National Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639, 643, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976).

A court also may impose any of the sanctions enumerated in Rule 37(b) upon a party who fails "to serve answers or objections to interrogatories," even if the Court has not ordered the party to answer the specific interrogatories. Fed.R.Civ.P. 37(d). Courts have interpreted Rule 37(d) narrowly, however, to apply only if the party acts in bad faith by *completely* failing to answer or object to the interrogatory. In *Fjelstad v. American Honda Motor Co.,* 762 F.2d 1334 (9th Cir. 1985), a defendant filed objections and answers to each of the plaintiff's interrogatories. The district court, relying exclusively on Rule 37(d), imposed sanctions on the de-

fendant because many of the defendant's answers were "incomplete, evasive and in some cases false." *Id.* at 1339 (quoting district court). The district court did not, however, find that the defendant's objections were meritless or offered in bad faith. *Id.* The Court of Appeals reversed the imposition of sanctions, holding that "Rule 37(d) ... did not give the district court authority to impose sanctions against" the defendant. *Id.* at 1339–40.

The Defendants in this case, unlike the defendant in *Fjelstad,* have acted in bad faith throughout this litigation. The Defendants have interposed some legitimate objections to the Plaintiff's interrogatories. In fact, the Court sustained some of these objections at the status conference. Other objections, however, were interposed merely to delay these proceedings. Thus, the Court may have the authority under Rule 37(d) to impose sanctions against Suzuki and American Suzuki. Because the Court has clearer authority to impose sanctions under other provisions, however, the Court will not decide this issue.

A court has the clear power to sanction parties for incomplete or evasive answers to interrogatories pursuant to Rule 26(g), which states in relevant part:

Every request for discovery or response or objection thereto ... shall be signed by at least one attorney of record.... The signature of the attorney or party constitutes a certification that the signer has read the request, response, or objection, and that to the best of the signer's knowledge, information, and belief formed after a reasonable inquiry it is: (1) consistent with these rules and warranted by existing law or a good faith argument for extension, modification, or reversal of existing law; (2) *not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation,* and (3) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.

If a certification is made in violation of this rule, the court, upon motion or upon its own initiative, *shall impose* upon the person who made the certificate, the party on whose behalf the request, response, or objection is made, or both, *an appropriate sanction,* which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee.

Fed.R.Civ.P. 26(g) (emphasis added). Although Rule 26(g) is modeled after Rule 11, Rule 26(g) does not require a signing attorney to certify the truthfulness of the client's answers to a discovery request. Instead, the lawyer must make "a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand." Fed.R.Civ.P. 26(g) advisory committee's note. Compliance is measured by an objective standard similar to the one imposed by Rule 11. *Id.*

The purpose of Rule 26(g) is to "curb discovery abuse by explicitly encouraging the imposition of sanctions." *Id.* Rule 26(g) "makes explicit the authority judges now have to impose appropriate sanctions and requires them to use it. This authority derives from Rule 37, 28 U.S.C. § 1927, and the court's inherent powers." *Id.* (citations omitted). Rule 26(g) "mandates that sanctions be imposed on attorneys who fail to meet the standards established in the first portion of 26(g)." *Id.*

■ Rule 26(g) explicitly permits a court to require one who violates the Rule to pay the opponent's attorney's fees and costs. Such an order is not, however, the only possible sanction. The advisory committee's notes indicate that the "nature of sanctions is a matter of judicial discretion to be exercised in light of the particular circumstances." *Id.* In deciding an appropriate sanction for a violation of Rule 26(g), a court should consider that Rule 37, which is designed to punish more egregious and specific violations, explicitly authorizes the most severe sanctions. Unlike Rule 37, Rule 26(g) does not explicitly permit a court to strike answers or enter a default judgment against an attorney or party who violates the Rule. This Court infers

from this difference that, in most cases, a court should not impose the most severe sanction for a violation of Rule 26(g), unless the party or attorney also has violated Rule 37.

■ If an attorney's conduct unreasonably increases delay and complexity in a case, but technically does not violate Rules 26(g) or 37, a court may require that attorney to pay the opponent's attorney's fees and costs pursuant to 28 U.S.C. § 1927. That Section provides: "Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct." A court may impose sanctions under section 1927 only if the attorney has acted in subjective bad faith or if the conduct itself is objectively vexatious. *Perkins v. General Motors Corp.,* 129 F.R.D. 655, 657 (W.D.Mo.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1309, 113 L.Ed.2d 243 (1991). An award of attorney's fees under Section 1927 is unrelated to the merits of the case. Section 1927 "does not distinguish between winners and losers, or between plaintiffs and defendants.... It is concerned only with limiting the abuse of court processes." *Roadway Express v. Piper,* 447 U.S. 752, 762, 100 S.Ct. 2455, 2462, 65 L.Ed.2d 488 (1980).

## II. *Application of the Standards to the Defendants' and Defense Attorney's Conduct*

As the facts outlined above clearly show, the Defendants and their attorneys deserve severe sanctions for extensive discovery abuses. Because the Defendants always provided partial answers, along with objections, to all of the Plaintiff's interrogatories and requests for production of documents, the Court will not impose sanctions pursuant to Rule 37(d). As explained below, the Court will impose sanctions pursuant to 28 U.S.C. § 1927, Rules 26(g) and 37(b)(2), and the Court's inherent powers.

### A. A Few Observations

Before announcing the sanctions to be imposed, the Court will comment on the factors

influencing its decision. The Court has decided to impose severe sanctions on the Defendants because their actions, as a whole, reveal a bad faith decision to avoid revealing the truth at all costs. The Court has chosen the most severe sanctions because no other sanction will deter these Defendants, and similarly situated parties, from repeating this egregious conduct.

The way to clear up confusion is to ask for clarification, not to twist a question's ordinary meaning into a meaning that is more comfortable for the person who must answer the question. Over and over in this litigation, the Defendants and defense counsel took the more comfortable route. They interpreted the Plaintiff's requests, and the Court's orders, as narrowly as possible. In taking that route, they thwarted the Plaintiff's attempts to obtain relevant and discoverable information in the time provided for discovery.

The Court is convinced that, if given another opportunity to comply with the Court's orders and to provide the Plaintiff with the information to which she is entitled, the Defendants would continue the same pattern of obfuscation. The Court reaches this conclusion because of statements made at the sanctions hearing. First, Mr. Freeman's explanations of why a "test" is not a "calculation" and how "static stability calculations" do not predict "rollovers" reveal that defense counsel intend to continue instructing the Defendants to interpret every request for discovery as narrowly as possible.

Second, Mr. Okiyama's testimony, given under oath, convinces the Court that the Defendants will continue to evade the truth. In the order scheduling a hearing "to determine whether sanctions should be imposed against one or both parties or their lawyers," the Court ordered each of the Defendants to send a corporate representative to the hearing. Because the written order did not explicitly specify the purpose for the corporate representatives' attendance, Mr. Goldman contacted Mr. Wayne Williams, the Courtroom Deputy, for clarification. Mr. Williams informed Mr. Goldman that corporate representatives familiar with the litigation, preferably the persons "pulling the strings," should attend. Thus, Mr. Goldman understood the reason the Court wanted a corporate representative to attend the hearing. Presumably, he informed Mr. Okiyama why the Court was requiring him to fly to Savannah from Japan.

Mr. Okiyama, the manager of Suzuki's legal department, indicated to the Court that he was not only familiar with the litigation, but also "in charge of handling it." (Tr.Hr'g at 6.)[5] He testified that he learned, at some point, that GM and Suzuki had corresponded with one another about marketing the Suzuki SJ410 or Samurai, and that GM had decided not to market it in the United States. *Id.* at 56. He also testified that he knew that the Plaintiffs sought this information in interrogatories, and that he later reviewed the answers provided to these interrogatories. *Id.* Nevertheless, when the Court asked Mr. Okiyama "Are there records in Suzuki's archives from GM regarding testing of the Samurai?" Mr. Okiyama replied, "I would have to check to find out." *Id.* at 55. The Defendants knew that the GM documents were at the core of the Plaintiff's complaint about their discovery abuses. Despite this knowledge, the manager of Suzuki's legal department, who is "in charge" of this litigation, flew all the way to the United States without finding out if these documents exist. The Court finds it difficult to believe that Mr. Okiyama was not personally familiar with these documents prior to this litigation, and completely unbelievable that he is unfamiliar with them now. Thus, both Mr. Okiyama's testimony and Mr. Freeman's statements have convinced the Court that, if given the chance for reform, the Defendants will continue to resist the Plaintiff's legitimate discovery demands.

## B. 28 U.S.C. § 1927

■ Sanctions are warranted against defense counsel, Joe C. Freeman, Jr., Michael J. Goldman, Patrick J. Becherer, and Philip Siracuse, because their participation in the

---

**5.** Mr. Okiyama communicated to the Court through an interpreter. Although interpretation often causes some difficulties in communication, the Court is convinced that the interpretation was accurate, and that Mr. Okiyama understood the questions asked of him.

Defendants' cover up of discoverable material multiplied "the proceedings ... unreasonably and vexatiously." 28 U.S.C. § 1927. The Court finds, upon a review of the documents presented to the Court, the status conference transcript, and the evidence presented at the sanctions hearing, that all four of these attorneys acted in subjective bad faith, and that their conduct was especially vexatious. As the Eleventh Circuit recently said about other lawyers:

> [W]e note that the attorneys of the Law Firm have conducted themselves in a manner not befitting officers of the court. It is axiomatic that attorneys owe a duty of candor to the court. Moreover, attorneys also have a duty to deal honestly and fairly with opposing counsel. The attorneys of the Law Firm have clearly failed to fulfill these duties. Indeed, they represent yet another case of attorneys having "sold out to the client." [citation omitted]. In so doing, the attorneys of the Law Firm lost sight of the fact that, as members of the bar, and officers of the court, our primary responsibility is not to the client, but to the legal system. Our judicial machinery is dependent upon the full support of all members of the bench and bar. Advocacy does not include "game playing." Conduct such as that engaged in here must not, can not and will not be tolerated.

*Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 799 F.2d 1510, 1522–23 (11th Cir.1986). Accordingly, the Court will require these attorneys to satisfy personally the Plaintiff's reasonable costs and attorney's fees. Their share of this burden will be described below.

### C. Rule 26(g)

■ Both defense counsel and the Defendants themselves deserve sanctions under Rule 26(g). Time after time, as explained in more detail above, the Defendants objected to interrogatories and other discovery requests as irrelevant or "overly broad and burdensome." As noted at the status conference, most of these interrogatories sought completely discoverable materials. Evidence does not have to be admissible to be discoverable. Rule 26(b)(1) explains that "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the sub-

ject matter involved in the pending action. ... It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). Thus, for the most part, the Defendants' objections to discovery requests lacked any merit whatsoever.

Although the Defendants provided partial answers to most of the Plaintiff's questions, these answers were often evasive and misleading. Analyzing this pattern of conduct, the Court concludes that the answers and objections were provided to cause unnecessary delay, to increase the cost of litigation for the Plaintiff, and to cause the time for discovery to end before the Plaintiff had obtained the discovery materials she needed to litigate this case. The Court therefore concludes that sanctions are warranted against the parties and the lawyers under Rule 26(g). The Defendants, along with defense counsel, will be jointly and severally required to pay the Plaintiff's attorney's fees and costs associated with this protracted and costly discovery period.

### D. Rule 37(b)(2)

■ The Court also will sanction the Defendants for disobeying a Court order in violation of Rule 37(b)(2). At the status conference, the Court ordered the Defendants to produce most of the discovery materials sought by the Plaintiff, including all requested information about testing, marketing and public relations, on all model Suzuki vehicles from 1984 forward. (Status Conf. at 11.) Although the Court never said "including any testing or marketing information originating from GM," the general order clearly encompassed this material. The Plaintiff's brief, attached to the Motion to Compel, emphasized the Plaintiff's desire for the GM materials. Moreover, defense counsel knew that the Plaintiff already had posed interrogatories seeking this information. Thus, the Defendants could not have misunderstood the Court's general order compelling "[a]ll of the information on these other similar-designed products." If the Defendants could not understand the order, entered orally at the

status conference, then they could have sought clarification from the Court. Instead, they simply chose to comply with part of the Court's order, and to ignore another part of the order.[6]

In addition, the Defendants supplemented the Plaintiff's interrogatories by stating that GM never decided not to market the Samurai. The fact that the Defendants supplemented this question at all suggests that they knew the Court's order required them to provide the GM information. Moreover, the supplemental answer withdrew the Defendants' objections to the interrogatory because the Defendants knew that the Court had overruled the objections. Thus, the Defendants appeared to be complying with the Court's order without having to disclose the damaging GM evidence. This strategy allowed the Defendants to answer any other interrogatories concerning GM by repeating that "GM never decided not to market the Samurai." Thus, the Defendants answered only as much of the question as they deemed absolutely essential to appear complaint. This action conforms to their strategy throughout this litigation. The Defendants' knowledge of the earlier interrogatories, coupled with this supplement to those interrogatories, belies their claim that they misunderstood the scope of the Court's order.

It is clear, moreover, that the Defendants refused to divulge this information, even after the Court ordered them to do so, because the information itself was so damaging. The GM materials suggest that Suzuki was aware that the SJ410 had a propensity to rollover, and that Suzuki knew that certain design changes were necessary to correct this problem. By showing that Suzuki did not change these design features before producing the Samurai and marketing it in the United States, it appears that the Plaintiffs will have a strong argument for punitive damages. Of course, Suzuki may be able to explain these documents in some other fashion; Mr. Freeman indicated that experts will testify that Samurai vehicles do not tend to roll over.[7] At any rate, it is clear that the GM evidence is extremely valuable to the Plaintiff.

The Plaintiff is fortunate that her attorneys knew about the GM documents from other unknown sources because it is clear that they *never* would have learned about this information from the Defendants. This fact demonstrates why the Defendants' actions are so egregious. Regardless of how tricky the Defendants have been in avoiding an overt lie, their actions have had the same result as an outright lie would have had. Asked over and over again to divulge information, and ordered to divulge that information by the Court, the Defendants still have not produced it. This bad faith conduct is unacceptable.

The Court has considered entering a clear order requiring the Defendants to divulge all of the information the Plaintiff seeks, including all correspondence with GM, and then extending the discovery period once again. The Court has decided, however, that this option will not solve the problem. Unless the Court inspects all of Suzuki's internal documents in camera, the Court will not be certain whether the Defendants have complied with the Court's new order. The manager of Suzuki's legal department claims, unconvincingly, that he must check the files

---

**6.** Defense counsel did not have time to read the Plaintiff's motion before the status conference, so he might have a legitimate claim that he did not realize that the motion to compel included the GM documents. He had ample opportunity, however, to read the brief after the conference. Assuming that he believed he had a valid reason not to disclose the GM evidence, the appropriate reaction would have been to ask the Court for a protective order, or for clarification of the Court's order entered orally at the status conference. Instead of seeking clarification or disclosing the GM documents, the Defendants chose to interpret the Court's general, all-encompassing order narrowly.

**7.** In fact, the Defendants have filed a motion in limine to exclude all of the GM documents. According to the Defendants, these documents are irrelevant because the SJ410 and the Samurai are different vehicles, and because the calculations done by GM do not accurately predict rollover. The Court has reviewed the Defendants' motion and reply brief on this issue. Regardless of how the Court ultimately rules on the motion in limine, it is clear that this evidence was *discoverable*. When the Plaintiffs asked for it, the Defendants should have revealed it. As the Court indicated at the status conference, the Court would not have permitted inadmissible evidence to be used at trial.

to ascertain if GM material even exists. The Court is convinced that to give the Defendants another chance would do nothing more than delay trial and increase the burden of this litigation on the Court and the Plaintiff.

Accordingly, the Court has decided that the only just sanction that will punish the Defendants adequately for their willful violation of this Court's order is to strike the Defendants' answers and to enter a default judgment for the Plaintiff. The Plaintiff will not have to prove liability at trial. A jury will decide what compensatory and punitive damages to award to the Plaintiff, if any.

### E. Court's Inherent Powers

The Defendants' actions have caused not only unnecessary delay and increased the cost of this litigation for the parties, but also an increased burden on the Court. The discovery disputes in this case have consumed hours of the Magistrate Judge's time, as well as hours of the District Judge's time. Countless "emergency" motions have been filed because of the Defendants' continuing refusal to cooperate in discovery. Because of this unnecessary burden, the Court will fine the Defendants and defense lawyers. The Court orders each of the Defendants to pay $5,000 to the Clerk of Courts. Each defense attorney of record is ordered to pay $500 to the Clerk of Courts.

### III. Application of Standards to Plaintiff's Counsel's Actions

As explained above, the Plaintiff's attorneys attempted, through a variety of techniques, to obtain information about a sealed case from Jones, Osteen, Jones & Arnold. The Court recognizes that the Plaintiff's attorneys were desperate, in the face of the Defendants' intransigence, to complete discovery by the Court's deadline, but that desperation does not excuse their actions. Even though they had never read the protective order from *Silverthorne/Burks,* the Plaintiff's attorneys knew that the files were sealed. They knew that they could not obtain this information from the attorneys in that earlier case. Mr. Butler mentioned in the sanctions hearing that the Magistrate Judge stated that protective orders prevent information

from being revealed to the public, but not to litigants. From this statement, Mr. Butler concluded that he could obtain information directly from Jones, Osteen, Jones & Arnold. Of course, the Magistrate Judge meant that a *court* could, in its discretion, release information from a previous case to a litigant, in spite of a protective order in the earlier case. Mr. Butler must have understood the Magistrate Judge's order in that fashion. Perhaps Mr. Butler's conclusion came from wishful thinking. Regardless of the reasons, however, the Court does not approve of these actions. Because the Plaintiff's attorneys' actions caused a law firm, which is not a party to this action, to have to file a motion for protective order, the Court, pursuant to its inherent powers, orders the Plaintiff's attorneys to pay Jones, Osteen, Jones & Arnold their reasonable costs of filing the motion. The Court requests Jones, Osteen, Jones & Arnold to submit a bill for costs to the Court within fifteen days of this Order. The Plaintiff's attorneys' actions also imposed upon the Court unnecessarily. The Court therefore orders the Plaintiff's attorneys to pay the Clerk of Courts $100.

### CONCLUSION

Needless to say, the Court is appalled at the discovery abuses that have taken place in this litigation. If the Court allowed the Defendants their way in this litigation, the Plaintiff would be completely unable to find the truth. Courts must react when this kind of abuse is discovered; otherwise we will never "secure the just, speedy, and inexpensive determination of every action." Fed. R.Civ.P. 1. If the Defendants do not deserve the most severe sanction available, then no one does.

In summary, the Court **ORDERS THE FOLLOWING:**

1. Within 20 days of this order, the Plaintiff will submit a bill for all costs and attorney's fees expended on discovery in this case. Expenses for activities not associated with discovery will not be included. If possible, the Plaintiff should include contemporaneous time records for attorney's fees.

2. Pursuant to 28 U.S.C. § 1927 and Rule 26(g), the Defendants and the defense coun-

sel of record will be required to pay the Plaintiff her reasonable attorney's fees and costs. The Court will decide what the final figure is after the Plaintiff submits her estimate of costs and fees.

3. Pursuant to Rule 37(b)(2), the Court **STRIKES** both of the Defendants' answers, and **ENTERS A DEFAULT JUDGMENT** against them as to liability. A jury will determine whether to award compensatory and punitive damages, and if so, in what amount.

4. Pursuant to the Court's inherent powers, the Court orders the Defendants to pay the Clerk of Courts $5,000 each. Each defense counsel of record is ordered to pay the Clerk of Courts $500.

5. The Court directs the Clerk of Courts to serve this order on Jones, Osteen, Jones & Arnold. The Court requests this law firm to submit to the Court an estimate of its costs associated with filing a motion for protective order in this case. The Court, pursuant to its inherent powers, orders the Plaintiff's attorneys to pay Jones, Osteen, Jones & Arnold these costs.

6. The Court further orders the Plaintiff's attorneys to pay the Clerk of Courts $100.

**No End In Sight**

Striking the Defendants' answers and entering a default judgment as to liability is a draconian sanction. It will prejudice the Defendants, who may have legitimate defenses to the Plaintiff's claims. Because of the severity of this sanction, the Court has considered imposing a variety of other sanctions on the Defendants. After careful consideration, however, the Court has concluded that the Defendants' conduct warrants imposing the most severe sanction possible. Anything less would be a mere slap on the wrist.

The Defendants have demonstrated that they prefer to obstruct the proceedings and litigate all issues. Cost, fees, and penalties, in this Court's view, will not solve the problem. Perhaps it is the attitude and conduct manifested in this case, and other instances, that persuaded Congress to enact the Civil Justice Reform Act of 1990. At some point, patience is *not* a virtue. Justice demands an element of decisiveness.

SO ORDERED.