**BOOKS ARE FUN, LTD., Plaintiff,**

v.

**Stephen ROSEBROUGH, Steven Craddock, Mark Rader, Virgil Streck, Reader's Choice Books, Inc., and Imagine Nation Books, Ltd., Defendants.**

No. 4:05–cv–00644–JEG.

United States District Court,
S.D. Iowa,
Central Division.

Jan. 19, 2007.

---

Christine S. Poscablo, John M. Callagy, Martin A. Krolewski, Michael Lynch, Robert W. Schumacher, II, Robert I. Steiner, Kelley Drye & Warren LLP, New York, NY, Deborah M. Tharnish, Gene R. La Suer, Steven L. Nelson, Davis Brown Koehn Shors & Roberts PC, David Wayne Nelmark, Belin Lamson Mccormick Zumback & Flynn, P.C., Des Moines, IA, for Plaintiff.

Cyril V. Smith, Sean P. Vitrano, Zuckerman Spaeder LLP, Baltimore, MD, Lance Winfield Lange, David Wayne Nelmark, Mark E. Weinhardt, Belin Lamson McCormick Zumback & Flynn, P.C., Wade R. Hau-

ser, III, David H. Luginbill, Ahlers & Cooney PC, Des Moines, IA, Adam Proujansky, Leslie R. Cohen, Michael R. Engleman, Dickstein Shapiro LLP, Washington, DC, Benny Waggoner, Waggoner Law Firm, Fairfield, IA, for Defendants.

## ORDER

GRITZNER, District Judge.

This matter comes before the Court on the Motion for Sanctions by Plaintiff Books Are Fun (Clerk's No. 92) against Defendant Imagine Nation Books, Ltd. ("Imagine Nation"), its president Earl Kaplan, and Dickstein Shapiro Morin & Oshinsky LLP (the "Dickstein Firm") (collectively, the "Resisting Parties"). The Dickstein Firm is a law firm representing Imagine Nation in this litigation and Kaplan in other matters and proceedings. This motion arises from various alleged discovery abuses supposedly facilitated by the Resisting Parties. Following a September 27, 2006, hearing, this matter is fully submitted and is ripe for disposition.

The Court is presented with a discovery history that is at once unusual and contentious. The circumstances give rise to quite reasonable concerns and suspicions on the part of the Plaintiff; but the question before the Court requires a determination of whether these reasonable concerns and suspicions rise to a demonstrated level of sanctionable conduct. Performing that task under these unique circumstances requires greater than normal discussion.

## FACTS[1]

Plaintiff Books Are Fun ("BAF") is an Iowa corporation based in Fairfield, Iowa, that uses independent sales representatives to sell books and gift items throughout the United States. Defendants Imagine Nation Books, Ltd. ("Imagine Nation"), currently engages and Defendant Reader's Choice once engaged in similar practices—the degree of which is an issue hotly contested in this litigation. Earl Kaplan, a witness but not a party in this action, founded BAF in 1990. By 1999, BAF had become a leading display marketer of books and gifts and had expanded its product line to premium hardcover books, gifts, stationery, and other educational products, which it offered to buyers at discounted prices. In this litigation, BAF brings a variety of commercial interference claims against Imagine Nation, Reader's Choice, and a number of former BAF employees and consultants.

## I. Alleged Failure to Disclose the Kaplan–Rosebrough Agreement.

In August 1999, Reader's Digest purchased BAF from Kaplan and a financial investor. As part of the transaction, Kaplan signed a Noncompetition, Nonsolicitation, Severance and Confidentiality Agreement (the "Non–Compete Agreement") with BAF and Reader's Digest, which barred Kaplan from participating with enterprises competing with BAF for a term ending in late 2004.

Defendant Stephen Rosebrough ceased working at BAF in 2003 to start his own company. He approached Kaplan in September 2003 about joining him in this venture. Kaplan and Rosebrough discussed "the broad outlines of a potential business arrangement." Kaplan Declar. ¶ 2; Rosebrough Decl. ¶ 4. A document was created outlining this potential arrangement (the "Kaplan–Rosebrough Agreement").

Rosebrough signed two copies of the Kaplan–Rosebrough Agreement in Kaplan's presence, but Kaplan claimed he could not immediately sign the document because he "could not locate a copy of [the] Non-[C]ompete Agreement, and so [he] could not move forward until [he] confirmed with [his] lawyer that the agreement expired that month." Kaplan Decl. ¶ 3; *see* Rosebrough Decl. ¶ 5; *see also* Kaplan Dep. 59:2–7; 128:1–40. Kaplan signed the Kaplan–Rosebrough Agreement before speaking with his lawyer but did not tell Rosebrough he had signed it and did not deliver a signed copy to Rosebrough. Instead, after speaking with his lawyer, Howard Jatlow of the Dickstein Firm, Kaplan "informed Rosebrough that [the] Non-[C]ompete Agreement did not expire for another year, and for that reason [he] could not

---

1. The factual setting for the current motion is drawn from the various pleadings, discovery responses, depositions, declarations, and affidavits made a part of the record. Factual determinations made are for purposes of the current motion alone.

become involved in the company [they] discussed." Kaplan Decl. ¶ 3; *see* Rosebrough Decl. ¶ 5; *see also* Kaplan Dep. 60:11–19; 128:5–16. Kaplan "attempted to dissuade [Rosebrough] from starting a company that would compete with BAF until after the term of [the] Non-[C]ompete Agreement had expired, out of concern that Reader's Digest and BAF would believe that [Kaplan] was involved, even if [he] was not." Kaplan Decl. ¶ 6; Rosebrough Decl. ¶ 6.

Kaplan kept both copies of the Kaplan–Rosebrough Agreement in his possession until giving them to Jatlow in November 2003. Kaplan delivered the documents in a sealed envelope and did not tell Jatlow what the envelope contained. Jatlow caused the envelope to be placed in a safe at the Dickstein Firm on January 14, 2004. The record contains no explanation of why an experienced legal professional would allow such a mystery envelope to be placed in the possession of his law firm without further information about the nature of the contents.

BAF claims that while Jatlow and Kaplan represent the envelope was transferred to Jatlow's possession at the close of a meeting taking place in Fairfield, Iowa, in late November 2003, involving legal matters unrelated to this litigation, those representations are suspect. BAF points to billing records produced by the Dickstein Firm in response to a request for "communications regarding any agreement . . . or business relationship, business arrangement, association, or plan of any kind, between Earl Kaplan and Steven Rosebrough . . . relating in any way to the book and/or marketing display businesses," showing that Jatlow participated in an 11–hour meeting in Fairfield on November 24, 2003. *See* Tharnish Aff. ex. 10, at 5, 14.

Although Rosebrough had represented to Kaplan that he had decided not to enter into the display marketing business, Rosebrough's plans changed, and he formed Defendant Reader's Choice Books, Ltd. ("Reader's Choice") in December 2003. The capital for the company was provided by a loan from Earl Kaplan's son. BAF contends Reader's Choice was identical in business purpose to BAF and quickly became one of its competitors. According to Rosebrough and Kaplan, Kaplan's participation in Reader's Choice's business practices was non-existent until Oc-

tober 2004, when Kaplan loaned Reader's Choice a sum of money and served for a short time as the company's "unofficial" chairman of the board. By that time, the Non–Compete Agreement had expired. Rosebrough and Kaplan aver that Kaplan's limited role at Reader's Choice ended after Kaplan "reviewed the condition of Reader's Choice's business." Kaplan Decl. ¶ 9; *see* Rosebrough Decl. ¶ 9.

In December 2004, Reader's Choice announced it was going out of business but allegedly assured its employees and sales representatives they would have opportunities to work for a company set up and operated by Kaplan. That company, Imagine Nation, was formed in December 2005 and is allegedly identical in business purpose to Reader's Choice and BAF, a contention Defendants "emphatically" deny. Reader's Choice went out of business in early 2005 and ceased all operations in June 2005.

On December 17, 2004, BAF served a subpoena *duces tecum* on Kaplan (the "Kaplan Subpoena") calling for, among other things,

4. All documents in [Kaplan's] possession regarding Steven Rosebrough from November 1, 2002, to through the present.

. . . .

10. All documents relating to the conception, discussion, negotiation, drafting, consummation or performance of any relationship between [Kaplan] and Steven Rosebrough.

. . . .

17. All documents, including but not limited to proposed, draft or actual contracts, letters of understanding, offers, acceptances, loan agreements, security agreements, notes, or other commercial paper, evidencing any agreement (or any draft or proposed agreement) or business relationship between Steven Rosebrough and [Kaplan].

. . . .

36. All documents of any financial transaction between [Kaplan] and Steve[n] Rosebrough, including but not limited

to checks, loan agreements, loan guarantees or any other document. Tharnish Aff. ex. 3, at 8 ¶ B.4; 9 ¶ B.10, .17; 14 ¶ B.36. According to BAF, each request calls for production of the Kaplan–Rosebrough Agreement.

A December 29, 2004. letter authored by Alexander Widell, a Dickstein Firm attorney, notes objections by Kaplan to the Kaplan Subpoena, arguing that the information sought was irrelevant and accusing BAF of impermissibly attempting to obtain information for use against Kaplan in a future action arising out of any arguable noncompliance with the Non–Compete Agreement. A second letter from Widell dated January 18, 2005, indicates Kaplan would agree to produce nonprivileged documents concerning his involvement with former BAF employees "regarding Reader's Choice" that were generated between November 1, 2002, until those employees left BAF. Widell offered to produce documents about the new company Kaplan had recently formed, RFA, Inc., which later became Imagine Nation.

BAF argues that Kaplan and the Dickstein Firm represented the Kaplan–Rosebrough Agreement did not exist. For example, BAF points to a portion of a January 26, 2005, letter from Jatlow to Michael Brizel, Reader's Digest's general counsel:

Notwithstanding the undated material you have forwarded to me, which refers to Mr. Kaplan as being associated with "Reader's Choice," we do not know of any such association, and our review of publicly available documents discloses no such association.

Tharnish Aff. ex. 7, at 5 n. 2.[2]

Kaplan was deposed on January 28, 2005. Kaplan produced one document responsive to the subpoena and testified he had no other documents responsive to the subpoena. Kaplan Dep. 8:19–9:7; 14:12–17; *see also* Kaplan Dep. 13:16–20 (excepting "personal communication" with Rosebrough, denying possessing documents responsive to Request No. 4, which called for "[a]ll documents . . . regarding Steven Rosebrough from November 1, 2002 to through the present"). In the view of BAF, by denying he had further

documents responsive to the Kaplan Subpoena, Kaplan denied the existence of the Kaplan–Rosebrough Agreement.

Widell defended Kaplan at his deposition and represented that Kaplan had produced all documents responsive to the Kaplan Subpoena relating to Reader's Choice:

Q: Take a look at requests 5 through 7. Do you have any documents that would be responsive to those?

A: No.

MR. WIDELL: If I can just be helpful, we can probably short circuit it by stating that Exhibit 1 with the financials are all the documents he has.

MR. LA SUER [counsel for BAF]: All the documents in his possession that he has relating to the subpoena?

MR. WIDELL: Relating to—if you put Reader's Choice Books as a qualifier. Maybe even without the qualifier, but certainly with Reader's Choice Books. . . .

Kaplan Dep. 13:21–14: 10.

On January 31, 2005, BAF's counsel wrote to the Dickstein Firm and requested certain financial documents referenced—but not produced—at Kaplan's deposition believed to be responsive to the Kaplan Subpoena. On March 15, 2005, counsel for BAF sent a similar letter, broadening the scope of documents sought. On March 25, 2005, the Dickstein Firm produced a "small number" of documents but did not produce the Kaplan–Rosebrough Agreement.

At his September 2005 deposition, Joel Feigenbaum, BAF's president, mentioned the rumored existence of a document similar to the Kaplan–Rosebrough Agreement. The following testimony is illustrative:

A: There have been conversations that people have had with me, again, that have said that Earl was involved giving direction [sic] with Reader's Choice prior to his noncompete [sic].

Q: Who said that to you?

A: I don't know his last name. His first name is Wally. He was Earl's pilot.

---

2. These comments were prepared by Jatlow to address Brizel's concerns that because the Dickstein Firm had represented Reader's Digest and BAF in previous matters, the firm should be disqualified from representing Kaplan in this litigation.

. . . .

A: [Recalling a conversation with the pilot,] I said—I asked—I said, "I understand you want to talk to me, you have some information"—"that you have some information that you want to tell me."

And [the pilot] said he felt very badly of what was going on and he knew of information that Earl was involved in certain things.

And I said, "Do you want to tell me?" And he gave me some specific examples.

. . . .

A: He told me he knew of an agreement that Steve [Rosebrough], [Kaplan's son], and Earl signed prior to Reader's Choice starting; that they signed an agreement and it is being kept in the safe of Howard Jatlaw [sic], their attorney.

Q: So this was an agreement that the three allegedly signed before Reader's Choice was formed, kept in a safe of Howard Jatlaw [sic]?

A: Correct.

Feigenbaum Dep. 511:17–23; 512:18–513:1; 514:23–515:6, Sept. 23, 2005. Leslie Cohen, a Dickstein Firm attorney, defended Feigenbaum during his deposition.

The Kaplan–Rosebrough Agreement was removed from the Dickstein Firm's safe on September 26, 2005, three days after Feigenbaum's deposition.[3] Jatlow, at Cohen's request, retrieved the envelope and summoned Kaplan to open it. Kaplan recalls opening the envelope he had given to Jatlow in November 2003, revealing both copies of the Kaplan–Rosebrough Agreement.

The Kaplan–Rosebrough Agreement was produced on December 19, 2005. A letter drafted by Cohen accompanying the document indicates it was "responsive to" the Kaplan Subpoena. *See* Tharnish Aff. ex. 8 (disclosing "recently located" documents including the Kaplan–Rosebrough Agreement

which were "responsive to the earlier subpoena directed to Earl Kaplan"). BAF claims no explanation was offered for the delay between Feigenbaum's deposition in September and the document's ultimate production in December.

## II. Other Alleged Discovery Abuses.

BAF contends Imagine Nation, Kaplan, and the Dickstein Firm engaged in other discovery abuses.

### A. Responses to BAF's Requests for Production of Documents.

The first arises out of alleged noncompliance with BAF's Requests for Production of Documents. On July 29, 2005, BAF served its First Request for Production of Documents upon Imagine Nation. On September 6, 2005, after the expiration of Imagine Nation's time to respond, the parties agreed to a thirty-day extension of time for Imagine Nation to respond but with the stipulation that Imagine Nation produce agreements between Imagine Nation and sales representatives or employees under contract with BAF within one week. No documents were produced by either the seven-day or thirty-day deadline.

On October 17, 2005, BAF served a Second Request for Production of Documents upon each Defendant. In Requests 36 through 38, BAF requested materials pertaining to, among other subjects, joint defense agreements, indemnity agreements, and documents relating to agreements regarding or the payment of attorneys' fees. *See* Def. Imagine Nation's Response to Pl.'s [Second] Req. for Produc. of Docs. # 36–38; Tharnish Aff. ex. 13. On November 21, 2005, Imagine Nation served written responses and objections to BAF's Second Request for Production of Documents but did not provide responsive materials to Requests 36 through 38. *See* Def. Imagine Nation's Response to

---

**3.** The declarations submitted by Kaplan and Jatlow contain numerous errors. For example, Kaplan avers he kept the Kaplan–Rosebrough Agreement in his possession until November 2005. Kaplan Decl. ¶ 4. This is an obvious error: Jatlow could not have placed the documents in the Dickstein Firm's safe in January 2004 if the documents were in Kaplan's possession until

2005. Jatlow's affidavit bears the same error. *See* Jatlow Aff. ¶¶ 3–4. Further, Kaplan and Jatlow indicate they met with Cohen in September 2006, when Kaplan opened the sealed envelope. Kaplan Decl. ¶ 5; Jatlow Decl. ¶ 5. Both declarations were executed in June 2006, so these representations are obviously erroneous. *See* Hr'g Tr. 99:10–100:7.

[Second] Req. for Prod. of Docs. # 36–38; Tharnish Aff. ex. 13.

On November 1, 2005, Imagine Nation served written responses and objections to BAF's First Request for Production of Documents. Imagine Nation objected to each request and produced no documents. *See* Def. Imagine Nation's Response to Req. for Prod. of Docs; Tharnish Aff. ex. 14. Between November 1, 2005, and December 2, 2005, BAF's counsel and attorneys at the Dickstein Firm exchanged telephone and e-mail communications, but Imagine Nation did not produce documents responsive to BAF's requests. On December 2, 2005, Imagine Nation produced a group of 334 documents responsive to BAF's First Request for Production of Documents. Imagine Nation admitted production was incomplete, but Cohen relayed in a December 2, 2005, e-mail that she remained hopeful "the remainder of the production [could be] completed within the next two weeks." Tharnish Aff. ex. 15, at 1.

**B. "Hyper–Confidentiality" Designations Applied to Virgil Streck's Testimony.**

Defendant Virgil Streck was deposed on December 8, 2005. At his deposition, Streck made reference to information relating to individuals who were then associated with BAF but who had indicated a desire to leave BAF and join Imagine Nation. The names of those individuals were concealed pursuant to a "hyper-confidentiality" agreement reached among the parties at the deposition designating that information as "hyper-attorney's eyes only." *See* Streck Dep. 212:22–214:16. According to BAF, this testimony amounted to "admissions" regarding improper recruiting efforts undertaken by Imagine Nation and Reader's Choice.

On December 13, 2005, BAF's counsel sent a letter to counsel for all Defendants, demanding the completion of BAF's requests for production of documents, specifically referencing materials reflecting improper recruiting efforts discussed at Streck's deposition. One day later, BAF's counsel sent letters to counsel for Defendants detailing alleged deficiencies in each of Defendant's objections to BAF's requests for production of documents.

**C. Production of Audio Recordings.**

On December 16, 2005, BAF's counsel wrote to the Dickstein Firm, this time demanding production of an unedited copy of an audio tape of a conference call held on December 11, 2005, sponsored by Imagine Nation and Kaplan. According to BAF, this call focused on educating BAF employees and contractors on methods to "get out of their [BAF] contracts and how to convince their [BAF] accounts and customers to move their business over to Imagine Nation." Tharnish Aff. ex. 20, at 1. While an edited version was publicly available on Imagine Nation's website, BAF claimed entitlement to a complete version under Request No. 26 of its First Request for Production of Documents.[4] The December 16, 2005, letter also demanded the "hyper-confidential" designation applied at Streck's deposition to the identities of certain BAF sales representatives be dissolved.

BAF alleges the Dickstein Firm refused to produce a copy of the audio tape, claiming it was not required to supplement its discovery responses by producing documents not in existence at the time of the initial request. As a result of an apparent refusal to supplement certain discovery responses and dissolve the "hyper-confidential" designation covering portions of Streck's testimony, BAF filed a Motion to Compel on January 28, 2006 (Clerk's No. 32), which Magistrate Judge Bremer granted on April 14, 2006 (Clerk's No. 77).

**D. Resisting Parties' Reaction to BAF's Motion to Compel.**

During the pendency of BAF's Motion to Compel, Imagine Nation allegedly reversed course on many positions regarding the disclosure of documents responsive to BAF's requests. First, BAF contends Imagine Nation initially refused to produce copies of

---

4. Request No. 26 called for "[a]ll notes, memorandums or tape recordings and/or transcripts of any conversations or communications involving any former or current employee of Books Are Fun or Reader's Choice." Pl.'s Req. for Produc. of Docs. to Def. RFA, Inc. d/b/a Imagine Nation Books # 26.

tapes made of public conference calls and open houses at which Imagine Nation recruited BAF representatives. After BAF filed its Motion to Compel, BAF claims Imagine Nation produced an audio file of the conference call held on December 11, 2005, but did not address BAF's requests for recordings of other calls. In March 2006, Imagine Nation produced recordings of other audio files which were "inadvertently omitted from" previous disclosures. Tharnish Aff. ¶ 33(a) & ex. 22.

Second, BAF claims Imagine Nation originally refused to produce documents relating to its decision to change its corporate name to Imagine Nation from RFA, Inc., as well as documents explaining the meaning of the name "RFA, Inc." Imagine Nation produced responsive documents after BAF filed its Motion to Compel.

Third, BAF contends Imagine Nation failed to produce all documents in its possession generated by Reader's Choice and BAF, as well as communications between Imagine Nation and individuals who were ever employees or contractors of BAF or Reader's Choice. After BAF filed its Motion to Compel, Imagine Nation produced responsive documents but restricted its disclosure to those documents generated before September 28, 2005.

Finally, BAF argues Imagine Nation refused to remove the "hyper-confidential" designation attached to portions of Streck's testimony relating to BAF employees who were planning to leave the company to join Imagine Nation. However, BAF claims Imagine Nation agreed to "de-designate" those por-

tions of the deposition after BAF filed its Motion to Compel.

BAF argues that during the time Imagine Nation was formulating responses to BAF's document requests, Imagine Nation and other Defendants filed motions designed to dismiss some or all of BAF's claims and otherwise hinder discovery. Specifically, BAF complains of Motions for Summary Judgment filed by Defendants Streck, Rader, and Craddock on February 27, 2006 (Clerk's Nos. 47–49) (which are presently pending); motions for partial dismissal filed by Imagine Nation on March 30, 2006 (Clerk's No. 64) (which was denied on September 6, 2006 (Clerk's No. 178)), and for a protective order pursuant to Federal Rule of Civil Procedure 26(c) (which was denied on April 14, 2006 (Clerk's No. 77)); and motions to strike BAF's damages disclosure and exclude its damages claim filed by all Defendants (Clerk's Nos. 71, 74) (which were denied on May 17, 2006 (Clerk's No. 107)).

Imagine Nation's cumulative conduct is characterized by BAF as "a series of discovery abuses" which vexatiously and unreasonably multiplied the proceedings, rendering sanctions appropriate under 28 U.S.C. § 1927 against the Dickstein Firm and under Federal Rule of Civil Procedure 26(g) against Imagine Nation and the Dickstein Firm. To the extent 28 U.S.C. § 1927 and Rule 26(g) do not capture the conduct BAF complains of, BAF contends the Court should impose monetary sanctions, issue an order requiring adverse jury instructions, and preclude some Defendants from advocating certain positions a trial, and/or revoke the *pro hac vice* admissions of various Dickstein Firm attorneys.[5]

---

5. Even though Reader's Choice, Rosebrough, Craddock, Rader, and Streck (the "Reader's Choice Defendants") and their counsel are not the subject of BAF's Motion for Sanctions, they have filed a resistance, arguing that if the Court grants BAF's request for "adverse inference and estoppels," the Court "would impose an unjust outcome on the Reader's Choice Defendants and would likely prevent them from putting on a defense at trial." Somewhat more specifically, the Reader's Choice Defendants claim that an adverse jury instruction and what they characterize as "argument preclusion" would result in unfair prejudice to them

 by (1) effectively contradicting the record evidence showing that Earl Kaplan had no involvement with Reader's Choice Books, Ltd. prior to the October 1, 2004, expiration of his

non-compete agreement, and (2) confusing the jury by making Imagine Nation and Reader's Choice Books, Ltd. appear to be interchangeable entities when they emphatically are not. Reader's Choice Defendants.' Resistance to Pl.'s Mot. for Sanctions 2; *see also* Joint Opp. to Pl.'s Mot. for Sanctions 7 n. 2.

 In response, BAF submits that because "there is ample evidence in the record to support Books Are Fun's claims against Reader's Choice," the Reader's Choice Defendants cannot be "innocent" bystanders. Pl.'s Reply Mem. in Supp. of Mot. for Sanctions 4 n. 6. As noted by counsel for Reader's Choice at oral argument, "innocence" for purposes of the merits of BAF's claims against all Defendants is an issue entirely different from "innocence" for purposes of considering compliance of all Defendants with discovery

## DISCUSSION

### I. Arguments of the Parties.

#### A. Disclosure of the Kaplan–Rosebrough Agreement.

BAF contends, and it now seems apparent, that because the Kaplan–Rosebrough Agreement shows a clear association between Kaplan and Reader's Choice, it should have been produced in response to the Kaplan Subpoena. BAF points to the letter accompanying the document's disclosure as evidence that the document was responsive to that subpoena; therein, Cohen admitted that the Kaplan–Rosebrough Agreement was "responsive to" the Kaplan Subpoena. BAF contends that because the document was responsive to that subpoena, Kaplan—who was aware of its existence—should have notified the Dickstein Firm of its existence and location.

BAF argues representations in Jatlow's January 26, 2005, letter to Brizel and by Widell at Kaplan's deposition insinuated documents like the Kaplan–Rosebrough Agreement did not exist, when in fact they did. And while BAF cannot point to a specific admission by Jatlow proving he was aware that the Kaplan–Rosebrough Agreement was in the sealed envelope provided by Kaplan, BAF claims circumstantial evidence suggests he was. Specifically, BAF contends billing records showing Jatlow's participation in a meeting with Kaplan at around the time the sealed envelope changed hands, coupled with Jatlow's provision of advice to Kaplan regarding the Non–Compete Agreement at approximately the same time, raises an inference that Jatlow was aware of the envelope's contents. Additionally, BAF argues that Jatlow's use of the indication in a footnote in a January 26, 2005, letter that he was unaware of "publicly available documents" that disclosed an association between Kaplan and Reader's Choice implies the negative: that Jatlow knew so-called "private" documents contradicted his assertion. Finally, BAF complains of tardy disclosure of the document because it was not disclosed until De-cember 2005 when it was referenced at Feig-enbaum's deposition in September 2005.

BAF urges the Court to

issu[e] an Order precluding Imagine Nation from making the argument that (i) Kaplan was not associated or involved with Reader's Choice prior to the expiration of his Non–Compete Agreement and that (ii) Imagine Nation is not the successor to Reader's Choice; or, alternatively, issuing a jury instruction which allows the jury to infer that Imagine Nation and Kaplan, through their attorneys, the Dickstein Firm, sought to withhold the Kaplan–Rosebrough Agreement because that document would support a claim that (i) Kaplan was associated and involved with Reader's Choice prior to the expiration of his Non–Compete Agreement and that (ii) Imagine Nation is Reader's Choice's successor.

Br. in Supp. of Mot. for Sanctions 25. BAF also argues sanctions are proper against the Dickstein Firm under 28 U.S.C. § 1927, and against Imagine Nation and the Dickstein Firm under Federal Rule of Civil Procedure 26(g).

With respect to Imagine Nation, the Resisting Parties point out that the Kaplan–Rosebrough Agreement was not in Imagine Nation's possession, custody, or control, and did not relate to any proposed or consummated business relationship involving Imagine Nation, rendering any sanction against Imagine Nation improper.

Next, the Resisting Parties claim that because the Kaplan–Rosebrough Agreement fell within objections made by Widell to the Kaplan Subpoena, its production at Kaplan's deposition was not required. The Resisting Parties note that Kaplan agreed to produce documents about his involvement with former employees of BAF regarding *Reader's Choice* from November 1, 2002, until the time those employees ceased working for BAF, as well as documents about the new company Kaplan had help form (a company which

orders and procedural rules. *See* Hr'g Tr. 90:16–91:9. The proposition that the merits of BAF's allegations against the Reader's Choice Defendants can provide buoyancy for what amounts to an adverse instruction against them arising from *other* Defendants' alleged discovery abuses is moored to the faulty premise that the Reader's Choice Defendants and the Resisting Defendants sink or swim together; it is not logically impossible for one Defendant to lose on a sanctions issue and another Defendant to succeed on a motion for summary judgment or at trial.

would later become Imagine Nation). Because the Kaplan–Rosebrough Agreement did not "relate" to Reader's Choice,[6] the Resisting Parties argue, the Kaplan–Rosebrough Agreement was not within the class of documents Kaplan agreed to produce.

Second, the Resisting Parties argue that Kaplan freely discussed the proposed business arrangement detailed in the Kaplan–Rosebrough Agreement at his deposition, conduct which belies any attempt to keep either the document or its contents secret.

Third, the Resisting Parties point to the haste with which Kaplan and the Dickstein Firm acted when the existence of the Kaplan–Rosebrough Agreement was revealed at Feigenbaum's deposition as further evidence of the absence of bad faith. They point out that Cohen, who defended Feigenbaum at his deposition, promptly investigated Feigenbaum's claim that the document existed and was located in the safe of the Dickstein Firm. After retrieving Kaplan, who opened the sealed envelope, Cohen began the process of determining whether the document should be produced.

Fourth, the Resisting Parties note that Kaplan–Rosebrough Agreement was produced before the parties had adopted a discovery schedule, before BAF took action to request or obtain it, and before BAF delayed or omitted discovery it demonstrably would

have pursued had it received the document earlier. Therefore, it is argued any prejudice arising from failing to produce the document earlier—even if such withholding was improper—is limited, and any multiplication of the proceedings as a result of its nondisclosure similarly constrained.

## B. Other Alleged Discovery Abuses.

Turning to the other contended discovery abuses, BAF argues Imagine Nation's failures to comply with BAF's demands for discovery resulted in a Motion to Compel, which was ultimately granted. However, before the Court could rule on the Motion to Compel, Imagine Nation abandoned most of the positions which instigated the motion, which BAF asserts demonstrated their baseless nature. As a result, BAF argues sanctions are appropriate against the Dickstein Firm under 28 U.S.C. § 1927, against the Dickstein Firm and Imagine Nation under Federal Rule of Civil Procedure 26(g), and against the Dickstein Firm, Imagine Nation, and Kaplan individually under the Court's inherent powers.

Responding to these arguments, the Resisting Parties characterize discovery in this case as an "arduous" task for all parties. In late June 2006, still the "early stages" of discovery, nearly one-half million pages of

---

**6.** Reaching this intermediate conclusion requires peeling away a few factual husks. The Resisting Parties claim the Kaplan–Rosebrough Agreement makes no reference to Reader's Choice and, in fact, describes a sequence of events leading to the creation of a company dissimilar to Reader's Choice. For example, the Kaplan–Rosebrough Agreement indicates Kaplan would provide the capital for the company, when Kaplan's son performed that role for Reader's Choice. *Compare* Kaplan Decl. ¶ 2 (explaining that under the proposal discussed in the Kaplan–Rosebrough Agreement, Kaplan was "to provide up to $1 million in funding and to secure bank financing and a line of credit for the new company"), *and* Tharnish Aff. ex. 1 (same), *with* Rosebrough Decl. ¶¶ 6–7 ("The seed money [for Reader's Choice] was provided by a $1.3 million loan to Reader's Choice that Ben Kaplan, [Rosebrough's] half-brother and Earl Kaplan's son, obtained from his grandfather, Sylvan Kaplan" and "Earl Kaplan did not provide any money to [Rosebrough] or Ben Kaplan for or in connection with Reader's Choice, did not secure financing for the company or procure a line of credit for it ...."), *and* Kaplan Decl. ¶ 8 ("[Kaplan] did not

secure financing for Reader's Choice or procure a line of credit for it"). Additionally, the stock ownership structure described in the Kaplan–Rosebrough Agreement is different from that established when Reader's Choice came into being. *Compare* Kaplan Decl. ¶ 2 (stating that under the proposed business arrangement, "Rosebrough was to receive 55% of the stock, and [Kaplan] was to receive 45% of the stock."); Tharnish Aff. ex. 1 (same), *with* Rosebrough Decl. ¶ 8 (indicating that Kaplan did not acquire stock in Reader's Choice), *and* Kaplan Decl. ¶ 8 (same). As a result, the Resisting Parties conclude, the Kaplan–Rosebrough Agreement did not "relate" to Reader's Choice and was therefore both outside the scope of the documents Kaplan agreed to produce and inside the scope of the objections lodged by Widell to the Kaplan Subpoena.

The Court need not decide whether Kaplan was required by Iowa law to produce the Kaplan–Rosebrough Agreement; the Court must only decide whether the decision not to produce it was animated by a purpose violative of the standards BAF claims the Resisting Parties contravened.

documents had exchanged hands. Technical problems encountered by a vendor retained by the Dickstein Firm further delayed production of documents responsive to BAF's requests. Finally, while the Court ultimately granted BAF's Motion to Compel, the Resisting Parties point out that the Court did not classify the arguments made in resistance to that motion as frivolous, nor did BAF move for sanctions at that time.

With respect to BAF's argument that its Motion to Compel was met with abandoned positions and shifting strategies, the Resisting Parties claim that instead of demonstrating the existence of frivolous arguments which were quickly deserted in the face of a Motion to Compel, their positions have demonstrated the type of flexibility idealized by the "meet and confer" obligations imposed by the discovery rules. They claim Imagine Nation's request for a protective order was a valid argument designed to contest whether Imagine Nation was entitled to additional safeguards before producing potentially commercially sensitive data.

## II. Propriety of Sanctions Under 28 U.S.C. § 1927.

First, BAF contends sanctions are appropriate under 28 U.S.C. § 1927 against the Dickstein Firm because the Dickstein Firm failed to produce the Kaplan–Rosebrough Agreement and unreasonably and vexatiously multiplied the proceedings by engaging in dilatory discovery practices.

### A. Standards for Sanctions Under 28 U.S.C. § 1927.

■ Sanctions are appropriate against [a]ny attorney or other person admitted to conduct cases in any court of the United States ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927 (2000).[7] Section 1927 requires attorneys to personally reimburse costs and fees incurred by an opposing party when counsel's conduct multiplies the proceedings in an improper way. *Clark v. United Parcel Serv., Inc.*, 460 F.3d 1004, 1011 (8th Cir.2006). The statute "is concerned only with limiting the abuse of court processes" by providing a remedy to those who suffer unreasonable and vexatious practices. *See Roadway Exp., Inc.*, 447 U.S. at 762, 100 S.Ct. 2455.

■ But "[b]ecause section 1927 is penal in nature, it should be strictly construed so that it does not 'dampen the legitimate zeal of an attorney in representing his client.'" *Lee v. L.B. Sales, Inc.*, 177 F.3d 714, 718 (8th Cir.1999) (quoting *Travelers Ins. Co. v. St. Jude Hosp. of Kenner, La., Inc.*, 38 F.3d 1414, 1416 (5th Cir.1994)). As a result, losing arguments are not always sanctionable ones. *See, e.g., EEOC v. Trans States Airlines, Inc.*, 462 F.3d 987, 996 (8th Cir.2006); *O'Connell v. Champion Int'l Corp.*, 812 F.2d 393, 395 (8th Cir.1987); *Gelco Corp. v. Baker Indus., Inc.*, 779 F.2d 26, 28 (8th Cir.1985); *see also Misischia v. St. John's Mercy Health Sys.*, 457 F.3d 800, 806 (8th Cir.2006) (holding that sanctions are not appropriate where conduct undertaken, even if "hardly worthy of praise," raises issues "subject to reasonable dispute").

■ Our circuit has hewn a test from the text of the statute with some difficulty. Historically, our circuit required "both a finding of objectively unreasonable behavior and a finding of bad faith" before imposing sanctions, *NAACP—Special Contribution Fund v. Atkins*, 908 F.2d 336, 340 (8th Cir. 1990) (citing *O'Connell*, 812 F.2d at 395 n. 2),[8] but more recent jurisprudence suggests an appropriate barometer is whether the "attorney's conduct '"viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court."'" *Clark*, 460 F.3d at 1011 (quoting *Tenkku v. Normandy Bank*, 348 F.3d 737, 743 (8th

---

7. For a discussion on the origins of this antiquated statute, *see Roadway Express, Inc. v. Piper*, 447 U.S. 752, 759–61 & nn. 6–9, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980).

8. While the *Atkins* court "indicated" that *O'Connell* stood for the proposition that section 1927

"appears to require both a finding of objectively unreasonable behavior and a finding of bad faith," *Atkins*, 908 F.2d at 340, a careful reading of *O'Connell* shows the court reserved ruling on that question, *see O'Connell*, 812 F.2d at 395 n. 2.

Cir.2003), in turn quoting *Perkins v. Spivey*, 911 F.2d 22, 36 (8th Cir.1990)); *accord Trans States Airlines, Inc.*, 462 F.3d at 996; *Lee v. First Lenders Ins. Servs., Inc.*, 236 F.3d 443, 445 (8th Cir.2001); *see Gundacker v. Unisys Corp.*, 151 F.3d 842–849 (8th Cir.1998) (classifying the section 1927 standard as objective); *L.B. Sales, Inc.*, 177 F.3d at 718 (same). Additionally, a court imposing sanctions must make factual findings of misconduct and provide an explanation for any sanction imposed so a reviewing court may ensure the imposition of sanctions was appropriate. *Tenkku*, 348 F.3d at 743; *accord L.B. Sales, Inc.*, 177 F.3d at 718–19 (specific factual findings supporting an award for sanctions "ensure that the sanctions address the excess costs resulting from the misconduct, provide the sanctioned party an adequate opportunity to respond, and facilitate meaningful appellate review").

Guided by these principles, the Court departs by analyzing conduct of attorneys at the Dickstein Firm.

### B. Alleged Failure to Produce the Kaplan–Rosebrough Agreement.

■ According to BAF, the Dickstein Firm should be sanctioned under section 1927 for its participation in a "cover up" of the Kaplan–Rosebrough Agreement orchestrated "to protect Kaplan and Imagine Nation from the impact which such incriminating evidence ... would have on this litigation." More specifically, BAF claims members of the Dickstein Firm "secreted the Kaplan–Rosebrough Agreement in the firm's safe for more than one year after it was first requested," and then made "misleading statements in response to questions that would have discovered the existence of the [document] if they had been answered honestly." [9]

BAF's assailment rests on the assumption that production of the Kaplan–Rosebrough Agreement was required by the Kaplan Subpoena and that at least one Dickstein Firm attorney was aware of the document's existence and failed to produce it. As noted above, BAF argues a number of requests specifically called for the Kaplan–Rosebrough Agreement:

4. All documents in [Kaplan's] possession regarding Steven Rosebrough from November 1, 2002, to through the present.

. . . .

(Clerk's No. 229) a Motion to Quash Subpoena (Clerk's No. 159) filed by Kaplan and the Dickstein Firm which barred BAF from deposing Jatlow regarding any documents he could be holding on Kaplan's behalf. An appeal of that ruling (Clerk's No. 233) is presently pending before this Court.

In a footnote, BAF points out that "neither Imagine Nation, Kaplan[,] nor the Dickstein Firm have disclosed to date, among other things: (i) what role the Dickstein Firm played in the Kaplan–Rosebrough Agreement; (ii) why Kaplan gave it to his lawyers for safe-keeping; (iii) why they withheld it for so long despite discovery requests calling for its disclosure; or (iv) why Mr. Jatlow represented to Reader's Digest and the Court that his firm was not aware of Mr. Kaplan being associated with Reader's Choice." Br. in Supp. of Mot. for Sanctions 17 n. 4. Item (ii) is not relevant to this portion of the pending motion, as the mental process leading *Kaplan* to give the agreement to his lawyers has little to do with imposing sanctions on *Imagine Nation* or the *Dickstein Firm;* items (iii) and (iv) are addressed (and discarded) below. Finally, BAF has pointed to no evidence suggesting the Dickstein Firm had *any* role in creating the Kaplan–Rosebrough Agreement, rendering item (i) an interesting question but not a relevant one.

9. According to BAF, at least one attorney at the Dickstein Firm—Jatlow—was aware of the Kaplan–Rosebrough Agreement in advance of Feigenbaum's September 2005 deposition. Billing records produced by the Dickstein Firm purportedly infer that Kaplan consulted with Jatlow in November 2004 regarding the Non–Compete Agreement and at that meeting gave the sealed envelope containing the Kaplan–Rosebrough Agreement to Jatlow. Because the business contemplated in the Kaplan–Rosebrough Agreement violated the Non–Compete Agreement, BAF argues, "there can be no question that Mr. Jatlow recognized that the Kaplan–Rosebrough Agreement—on its face—constituted a breach of his Non–Compete Agreement." At oral argument, however, BAF appeared to concede that no evidence had then been uncovered demonstrating any attorney at the Dickstein Firm had knowledge of the contents of the sealed envelope in the firm's safe. *See, e.g.,* Hr'g Tr. 79:5–7 ("[C]an I stand here and tell [the Court] that I know that Howard Jatlow knew what was in that envelope? I can't. I can't do that, Your Honor."); *see also* Hr'g Tr. 73:19–77:19. While counsel for BAF implied that if Jatlow were deposed such information would be unearthed, that representation was speculative and not founded on positive evidence of bad faith. Additionally, on November 20, 2006, United States Magistrate Judge Celeste F. Bremer granted

10. All documents relating to the conception, discussion, negotiation, drafting, consummation or performance of any relationship between [Kaplan] and Steven Rosebrough.

. . . .

17. All documents, including but not limited to proposed, draft or actual contracts, letters of understanding, offers, acceptances, loan agreements, security agreements, notes, or other commercial paper, evidencing any agreement (or any draft or proposed agreement) or business relationship between Steven Rosebrough and [Kaplan].

. . . .

36. All documents of any financial transaction between [Kaplan] and Steve Rosebrough, including but not limited to checks, loan agreements, loan guarantees or any other document.

Tharnish Aff. ex. 3, at 8 ¶ B.4; 9 ¶ B.10, .17; 14 ¶ B.36. There was always a plausible argument that at least some of these requests call for the Kaplan–Rosebrough Agreement. Like the Kaplan–Rosebrough Agreement itself, these requests do not mention Reader's Choice; they seek "agreements," "contracts," "relationships," and other information in Kaplan's possession "regarding" Rosebrough or evidencing certain transactions between Kaplan and Rosebrough. Ultimately, in the letter accompanying its production to BAF, Cohen concedes that the Kaplan–Rosebrough Agreement was being produced because it was "responsive to" the Kaplan Subpoena.

The record shows that instead of producing documents responsive to the Kaplan Subpoena, the Dickstein Firm lodged objections. In his December 29, 2004, and January 18, 2005, letters, Widell objected to each of BAF's document requests, and in his January 18 letter agreed to produce "non-privileged documents concerning [Kaplan's] involvement with former employees of [BAF] regarding *Reader's Choice Books,* to the extent he has any such documents in his custody and control," as well as documents relating to the company which would become Imagine Nation. Widell represented at Kaplan's deposition that all documents relating to Reader's Choice had been produced. The Resisting Parties persuasively argue the

Kaplan–Rosebrough Agreement did not relate to an agreement to form either Reader's Choice or Imagine Nation, so its production was not required—assuming, of course, that at least one attorney at the Dickstein Firm was aware of its existence at the time of Kaplan's deposition. This argument, if accepted, would support the accuracy of Jatlow's January 26, 2005, representation to Brizel that the Dickstein Firm was unaware of an association between Kaplan and Reader's Choice.

On the one hand, attorneys acting ostrich-like to avoid producing discoverable documents is absolutely impermissible. And, the duty to make reasonable inquiry does seem to collide with the known existence of a mystery envelope in the firm safe. But on the other hand, to prove the Dickstein Firm intentionally concealed a document known to be responsive, BAF must show a Dickstein Firm attorney knew Kaplan had given to one of its members such a document. BAF does not dispute that the Kaplan–Rosebrough Agreement rested for some time in the bowels of the Dickstein Firm in a sealed envelope commencing at a time preceding the initiation of this litigation. BAF has generated suspicion but no evidence suggesting Jatlow (or anyone else at the Dickstein Firm) knew what the envelope contained. In fact, BAF admitted it had no evidence that any Dickstein Firm attorney knew the document existed until Feigenbaum's deposition in 2005. The logical conclusion would seem to argue the Court should penalize the Dickstein Firm for failing to peek inside a sealed envelope provided by a client to ensure its contents were not discoverable in an action that had not yet commenced.

In the absence of more convincing proof that any Dickstein Firm attorney knew that an envelope in its safe contained a document responsive to the Kaplan Subpoena, BAF's argument reduces to a complaint about the delay between the time at which a Dickstein Firm attorney became aware of the document (September 26, 2005) and its eventual production (December 19, 2005).

While in some circumstances a September–to–December delay could constitute unreasonable conduct manifesting either intention-

al or reckless disregard of an attorney's duties to the court, this is not such a case. The record shows the Dickstein Firm acted with reasonable haste to investigate claims made at Feigenbaum's deposition regarding the potential for a document in the firm's safe. Cohen promptly investigated Feigenbaum's allegations: the sealed envelope containing the Kaplan–Rosebrough Agreement was retrieved from the Dickstein Firm's safe two days after Feigenbaum was deposed. The Kaplan–Rosebrough Agreement was produced before the parties had adopted a discovery schedule, before BAF sought court intervention to obtain it, and before BAF delayed or omitted discovery it would have otherwise pursued had it received the document earlier.[10]

BAF's principal case is inapposite. BAF correctly cites *Malautea v. Suzuki Motor Corp.*, 148 F.R.D. 362, 369 (S.D.Ga.1991), *aff'd*, 987 F.2d 1536 (11th Cir.1993), for the proposition that helping a client conceal a discoverable document can support section 1927 sanctions. The sanctions in *Malautea* resulted after a protracted period of dilatory discovery tactics undertaken by defendants who, among other things, made "a bad faith decision to avoid revealing the truth at all costs" by concealing certain documents, ignoring several court orders and verbal warnings along the way. *See* 148 F.R.D. at 363–70, 372–74. The court determined counsel actively participated in an attempt to cover up certain documents damaging to the defendant. *Id.* at 369, 373–74. The court concluded the attorneys involved were aware of the character, content, and discoverable nature of the documents in question but still elected not to disclose them. *See id.* at 369. As a result of "their participation in the ... cover up of discoverable material [which] multiplied 'the proceedings ... unreasonably and vexatiously'", section 1927 sanctions were appropriate. *Id.* at 373–74 (quoting 28 U.S.C. § 1927) (third alteration in the original).

Two key differences exist between *Malautea* and these proceedings. First, the court's opinion suggests the documents in question were not produced by the defendants but were obtained from another party. *See id.* at

369. Second, bad faith conduct permeated the proceedings. There,

> [an attorney] participated in the cover up of [certain] damaging evidence. Defense counsel either carelessly or deliberately failed to comply with two orders to produce deposition transcripts until the plaintiff moved for sanctions. Throughout discovery, the defendants, through their counsel, unreasonably objected to the plaintiff's requests for information and provided incomplete answers as part of their campaign to obfuscate the truth. . . .
>
> In addition, [the district court properly found] that this bad faith conduct multiplied the proceedings unreasonably and vexatiously. Defense resistance to discovery required [the district court] to issue three orders compelling the production of information that should have been produced without any judicial prompting. The defendants' delay in producing deposition transcripts required [a magistrate judge] to issue a second order compelling production of the transcripts. Countless motions, responses, briefs in support and opposition, and letters to the district court occupied far more of the court's time than the case itself required. Moreover, defense intransigence necessitated an evidentiary hearing regarding sanctions, a thirty-eight page order imposing sanctions, and [an] appeal.

*Malautea*, 987 F.2d at 1544–45. The conduct of the Dickstein Firm attorneys is simply not comparable on the available record. No court involvement was required to compel production of the Kaplan–Rosebrough Agreement. BAF has not uncovered evidence suggesting the Dickstein Firm took affirmative steps to conceal the Kaplan–Rosebrough Agreement once its character was revealed. And the record does not suggest the Dickstein Firm acted with unnecessary delay to disclose the document once members of that firm were aware of its character.

The Court concludes the record of conduct by Dickstein Firm attorneys does not reveal "either intentional or reckless disregard of the attorney[s'] duties to the court." *Clark*, 460 F.3d at 1011 (quotation marks omitted).

---

**10.** The Court is not unmindful that having the document at the time of the Kaplan deposition

would have allowed a more informed examination.

BAF's request for section 1927 sanctions against the Dickstein Firm for its participation in the delayed production of the Kaplan–Rosebrough Agreement must therefore be denied.

### C. Other Alleged Discovery Abuses.

■ BAF also claims section 1927 sanctions are warranted because the Dickstein Firm advocated a menagerie of "improper legal positions," which it then abandoned after BAF filed a Motion to Compel. The Dickstein Firm is also accused of unnecessarily multiplying the complexity of these proceedings by withholding certain documents in the face of valid discovery requests.

First, BAF contends the Dickstein Firm championed the position that Imagine Nation was not obligated to supplement discovery responses with documents and information generated after providing responses and objections to BAF's First Request for Production of Documents. BAF contends the Dickstein Firm argued that supplemental requests were required if BAF wanted supplemental answers. BAF contends this conduct was "frivolous" in light of the duty to supplement discovery responses imposed by Federal Rule of Civil Procedure 26(e).[11]

To provide an example, BAF points to the delayed production of audio recordings of certain conference calls, including the December 11, 2005, conference call BAF contends Imagine Nation and Kaplan organized. BAF argues it was entitled to complete recordings under Request No. 26 in its First Request for Production of Documents, which sought, among other things, "tape recordings . . . of any conversations or communications involving any former or current employee of Books Are Fun or Reader's Choice." BAF's counsel then specifically identified the recordings sought in a December 16, 2005,

letter. BAF argues the Dickstein Firm refused to produce these recordings until BAF filed its Motion to Compel, at which point the Dickstein Firm and Imagine Nation relented.

Second, BAF claims the Dickstein Firm "changed nearly all of its positions on discovery" in response to BAF's Motion to Compel. More precisely, BAF argues the Dickstein Firm vacillated on the disclosure of "documents relating to RFA, Inc.," the disclosure of "documents generated by Reader's Choice and [BAF] and communications between Imagine Nation and individuals who were ever employees or contractors for [BAF] or Reader's Choice," as well as the elimination of the "hyper-confidential" designation applied to portions of Streck's testimony. BAF claims that while the Dickstein Firm and Imagine Nation later agreed to produce some documents and recordings, they took the position that documents generated after September 28, 2005, should be governed by a protective order. BAF correctly notes this Court ultimately rejected that argument. BAF argues sanctions are now appropriate as a result of the delay spawning from "Imagine Nation's continued unjustified objections."

Responding, the Dickstein Firm points out that discovery has been burdensome for all parties involved. As of June 2006, nearly one-half million pages of documents had exchanged hands. And as noted above, technical problems with the Dickstein Firm's vendor delayed production of certain documents responsive to BAF's requests—a contention BAF does not challenge. Further, the Dickstein Firm notes that while the Court ultimately granted BAF's Motion to Compel and denied Imagine Nation's request for a protective order, neither the Court nor BAF classified Imagine Nation's arguments as frivolous at the time.[12]

---

**11.** Rule 26(e) provides in pertinent part that,
[a] party who has . . . responded to a request for discovery with a disclosure or response is under a duty to supplement or correct the disclosure or response to include information thereafter acquired if ordered by the court or in the following circumstances:
. . . .
(2) A party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect

and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.
Fed.R.Civ.P. 26(e).

**12.** Moving for a protective order under Rule 26(c), as Imagine Nation did, is an appropriate way to seek some control over the disclosure of documents otherwise discoverable. *See* Fed. R.Civ.P. 26(c).

Two recent cases provide examples of the high bar which must be met to warrant sanctions under section 1927. In the first, in response to a motion for summary judgment filed by the defendants, the plaintiffs' attorney filed a 480–page response which violated a host of local rules. *See Clark,* 460 F.3d at 1007. After disregarding the plaintiffs' filing and granting summary judgment in favor of the defendants, the district court imposed sanctions under Federal Rule of Civil Procedure 11 and section 1927. *See id.* Upholding the district court's imposition of Rule 11 sanctions, the Eighth Circuit also found ample support for the district court's finding that, viewed objectively, the attorney recklessly disregarded his duties to the court. *See id.* at 1010. The court found reasonable the district court's conclusion that the length of the plaintiffs' attorney's filings, "combined with unsupported attempts to controvert facts (including misstatements and mischaracterizations of the record), failures to provide citations to the record, improper use of cumbersome cross-references, and inappropriate inclusion of legal argument in a purported listing of disputed material facts, made the pleading unduly burdensome." *Id.* at 1010.[13] The court concluded that "[t]he district court's reasons for disregarding the non-compliant pleading and imposing Rule 11 sanctions also support[ed] a finding that counsel 'multiplie[d] the proceedings ... unreasonably and vexatiously.'" *Id.* at 1011 (quoting 28 U.S.C. § 1927; omission and third alteration in the original).

In *Tenkku v. Normandy Bank,* the plaintiff, a vice president and cashier of a bank, resigned following a negative performance review and after failing to earn a promotion when an annual audit and FDIC investigation unearthed errors in both her own work and the product of workers in a department she oversaw. *Tenkku,* 348 F.3d at 739–40.

During the discovery phase of a subsequent employment discrimination action, the FDIC required the plaintiff to return a copy of a report it prepared which documented shortfalls the agency uncovered. *Id.* at 743. The plaintiff was ordered to return her copy of the report; the FDIC provided a redacted copy for use in the plaintiff's lawsuit. *Id.* The plaintiff then requested a complete copy of the report and filed a motion to compel its production. *Id.* Following cross-motions for sanctions, the district court ordered the plaintiff to reimburse the FDIC for costs and fees it incurred "in defending against her frivolous motion to compel." *Id.* Except for its observation that the court erroneously imposed sanctions on the plaintiff (instead of her attorney), the Eighth Circuit affirmed. *Id.* at 743–44. The court specifically noted that the plaintiff's motion for sanctions filed one day after demanding a copy of the complete report from the FDIC "while frivolous of its own accord, [was] the latest example of a pattern of unnecessary and hostile pleadings the court has been forced to review ..., all of which created unnecessary and protracted delays in discovery." *Id.* at 744 (quotation marks omitted). Section 1927 sanctions were thus appropriate.

Other examples of the type of conduct warranting sanctions under section 1927 are readily available. *See, e.g., Lee v. First Lenders Ins. Servs., Inc.,* 236 F.3d 443, 445 (8th Cir.2001) (upholding sanctions where counsel pursued "baseless class action claims [which] dominated discovery and motion practice for an extended period" before abandoning them without explanation, leading defendants "to incur additional costs to defend the case as a class action"); *Kan. Pub. Employees Retirement Sys. v. Reimer & Koger Assocs.,* 165 F.3d 627, 629–31 (8th Cir.1999) (upholding imposition of sanctions where attorneys initiated litigation in state court to

**13.** The court also upheld the district court's finding of bad faith under a subjective standard. *See Clark,* 460 F.3d at 1010–11. The court found it particularly illustrative "that portions of the pleading were created for the sole purpose of causing unnecessary delay and a needless increase in the cost of litigation." *Id.* at 1010 (quotation marks omitted). The court endorsed the district court's finding that the document "represented a form [of] litigation by attrition, wherein the practitioner's intent was to force the opposition either to yield to its position or be crushed under a great weight of misstated factual assertions and be drowned in a sea of bombast." *Id.* (alteration in the original; quotation marks omitted).

obtain a favorable ruling for use in federal proceedings where the federal courts had already decided the issue raised in state proceedings, thereby hindering the ability of a federal court to resolve the case in an efficient and expeditious manner); *Gundacker*, 151 F.3d at 849 (upholding sanctions where an attorney "disobeyed court orders, violated his duty as an officer of the court by making false representations, spoke to at least one member of the press concerning [the instant as well as a] sealed *qui tam* action, and made various threats directed at the court"); *Perkins v. Gen. Motors Corp.*, 965 F.2d 597, 600–02 (8th Cir.1992) (upholding sanctions against an attorney imposed under, among other provisions, section 1927 for "persistently pursuing unsupported factual allegations," filing pleadings known to be false, "intentionally fail[ing] to disclose [the name of a witness expected to testify] in order to surprise [the defendant] at trial," "misrepresenting to the court the testimony of several witnesses," and "filing a motion to recuse the judge," which "smacked of bad faith"); *Platt v. Jack Cooper Transp. Co.*, 959 F.2d 91, 96–97 (8th Cir.1992) (imposing section 1927 sanctions for the pursuit of a "frivolous appeal to the denial of a frivolous motion" after plaintiff appealed a district court's denial of Rule 11 sanctions sought in "response to a sanctions order in an unrelated case that [the same district judge] entered against [the plaintiff]'s counsel in favor of a party represented by the law firm that represent[ed the defendant]"); *see also Lupo v. R. Rowland & Co.*, 857 F.2d 482, 485–86 (8th Cir.1988) (upholding the imposition of section 1927 sanctions as "an alternative ground for affirmance" where plaintiffs' counsel "had conducted the litigation in a manner that escalated costs unnecessarily and vexatiously" (quotation marks omitted)).

Here, the fact that the Dickstein Firm's arguments were made during the course of a losing campaign does not necessarily imply the arguments made were frivolous or were designed to multiply these proceedings unreasonably or vexatiously. All parties in this case have assumed an aggressive and sometimes tempestuous posture regarding the timeliness and completeness of discovery requests, responses, and other filings. Still, the conduct undertaken by the Dickstein Firm representing Imagine Nation during discovery, while resistant and aggressive and seemingly unduly so, does not reach that required to warrant the imposition of sanctions under section 1927. The Dickstein Firm has not submitted needlessly voluminous filings violative of the local rules in an attempt to suffocate its opponent, *see Clark*, 460 F.3d at 1007, 1010–11; it has not filed frivolous documents with the Court unfounded in law or fact designed to delay the proceedings, *see Tenkku*, 348 F.3d at 740–44; it has not filed duplicative proceedings elsewhere in an attempt to congest these proceedings, *see Kan. Pub. Employees Retirement Sys.*, 165 F.3d at 629–31; it has not repeatedly disobeyed orders of this Court, *see Gundacker*, 151 F.3d at 849; and it has not filed documents it knew were false upon submission, *see Gen. Motors Corp.*, 965 F.2d at 600–02.

Further, instead of completely shifting course when faced with BAF's Motion to Compel, the record suggests Imagine Nation produced some documents as a result of negotiations designed to resolve discovery disputes without court intervention. The Dickstein Firm then sought a protective order to crystalize its belief that some documents BAF wished to see were not discoverable but were instead part of a BAF enterprise to drill a peephole into its business practices to surveil its inner workings. The fact that

Imagine Nation was unsuccessful does not require a finding that the Dickstein Firm's efforts were objectively unreasonable.

No party should assume from the above discussion this Court's endorsement of a strategy that the proper method of responding to valid discovery requests is prolonged recalcitrance followed by hasty compliance upon the submission of a motion to compel. Yet a possible change of position or legal view upon further reflection must be accommodated without the burden that such a change be regarded as an admission of prior misconduct. Thus, the Court must examine the record for more than simply what appears on the surface. Having done so, the Court finds this record insufficient.

BAF's motion for section 1927 sanctions against the Dickstein Firm for alleged discovery abuses must be denied.

### III. Propriety of Sanctions Under Federal Rule of Civil Procedure 26(g).

Next, BAF moves for sanctions against Imagine Nation and the Dickstein Firm under Federal Rule of Civil Procedure 26(g)(2) and (g)(3). Rule 26(g) provides, in relevant part, as follows:

(2) Every discovery request, response, or objection made by a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name.... The signature of the attorney ... constitutes a certification that to the best of the signer's knowledge, information, and belief, formed after a reasonable inquiry, the request, response, or objection is:

. . . .

(B) not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and

(C) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.

. . . .

(3) If without substantial justification a certification is made in violation of the rule, the court ... shall impose upon the person who made the certification, the party on whose behalf the disclosure, request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee.

Fed.R.Civ.P. 26(g)(2)-(3). Unlike Rule 11 sanctions, which are awarded at a court's discretion, Rule 26(g) requires sanctions if a violation of the rule is found. *Compare* Fed. R.Civ.P. 11(c) (providing that a court "may," with some limitations, "impose an appropriate sanction"), *with* Fed.R.Civ.P. 26(g)(3) (mandating that "the court ... shall impose ... an appropriate sanction").

Rule 26(g) sanctions are designed "to deter abuse and compensate the opposing party for 'all expenses, whenever incurred, that would not have been sustained had the opponent conducted itself properly.'" *Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co.*, 19 F.3d 431, 439 n. 10 (8th Cir.1994) (quoting *In re Stauffer Seeds, Inc.*, 817 F.2d 47, 49 (8th Cir.1987) (quotation marks omitted)); *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 62, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (Kennedy, J., dissenting) (noting that Rule 26(g) allows a court to "sanction a party and/or his attorney for baseless discovery requests or objections"). "[B]y explicitly encouraging the imposition of sanctions," this rule is "a deterrent to both excessive discovery and evasion by imposing a certification requirement that obliges each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection." Fed.R.Civ.P. 26 advisory committee's note to 1983 amendment.

The imposition of sanctions under Rule 26(g) is proper "when the signing of [a discovery response] is incomplete, evasive or objectively unreasonable under the circumstances." *St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.*, 198 F.R.D. 508, 515 (N.D.Iowa 2000); *accord Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oreg. Ltd.*, 76 F.3d 1003, 1007 (9th Cir.1996) (employing "an objective standard to determine whether a party or attorney has responded or objected to a discovery request for an improper purpose"); *Chapman & Cole v. Itel Container*

*Int'l B.V.*, 865 F.2d 676, 685–86 (5th Cir.1989) (same); *Apex Oil Co. v. Belcher Co. of New York, Inc.*, 855 F.2d 1009, 1015 (2d Cir.1988) (same); *see also In re Byrd, Inc.*, 927 F.2d 1135, 1137 (10th Cir.1991) (collecting authorities); Fed.R.Civ.P. 26 advisory committee's note to 1983 amendment (the "reasonable inquiry" standard is "an objective standard similar to the one imposed by Rule 11"). The most obvious situation where sanctions are appropriate occurs where a party or its attorney submits a false discovery document. *See Gen. Motors Corp.*, 965 F.2d at 600 n. 5 ("A court shall impose a sanction upon the party and/or her attorney when a false discovery document is signed").

Unfortunately, examples of conduct warranting sanctions are easily obtainable. *See, e.g., Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1372–73 (11th Cir.1997) (upholding as not clearly erroneous a district court's conclusion that a violation of Rule 26(g) occurred when a party "withheld admittedly relevant information, and engaged in dilatory tactics," but reversing because the sanction imposed exceeded the needs of the case); *Rothman v. Emory Univ.*, 123 F.3d 446, 455 (7th Cir.1997) (production of "three large bankers' boxes of … papers and numerous other unrelated, non-responsive materials" sufficient to warrant Rule 26(g) sanctions in an uncomplicated discrimination case); *Legault v. Zambarano*, 105 F.3d 24, 26–27 (1st Cir.1997) (Rule 26(g) sanctions against counsel and client upheld where discovery responses indicated performance on an objective multi-stage test motivated hiring decisions later proved to be a "sham," and a "flat violation" of Rule 26(g)(2)); *Oregon RSA No. 6, Inc.*, 76 F.3d at 1008 (upholding Rule 26(g) sanctions where discoverable documents were concealed); *Resolution Trust Corp. v. Dabney*, 73 F.3d 262, 268–69 (10th Cir.1995) (upholding sanctions award where subpoena duces *tecum* served on the eve of trial "sought untimely discovery of documents which should have been obtained through the normal discovery process within the discovery deadlines imposed by the court's scheduling order," sought documents which had already been requested, and was "interposed for purposes of harassment, unnecessary delay and increase in the cost of litigation"); *Malautea*, 987 F.2d at 1545

(sanctions appropriate for reasons detailed above).

In addition for its role in the production of the Kaplan–Rosebrough Agreement, BAF argues sanctions are appropriate "under Rule 26(g) against Imagine Nation and the Dickstein Firm for their protracted and dilatory conduct in responding to [BAF]'s proper discovery requests." Although it does not delineate the allegedly deficient responses to its discovery requests, a fair reading of its papers suggest its allegations here mirror those made above.

### A. Alleged Failure to Produce the Kaplan–Rosebrough Agreement.

█ Beginning with the requested sanctions against the Dickstein Firm, the Court's conclusion above that no showing has been made by BAF that any Dickstein Firm attorney was aware of the Kaplan–Rosebrough Agreement until Feigenbaum's deposition applies here as well. Therefore, assuming the Kaplan–Rosebrough Agreement was swept within the requests made in the Kaplan Subpoena, sanctioning the Dickstein Firm would be improper. *See Maynard v. Nygren*, 332 F.3d 462, 470 (7th Cir.2003) (imposition of Rule 26(g) sanctions against counsel improper where "counsel had no knowledge that the discovery response was inadequate"). Further, even if members of the Dickstein Firm were aware of the Kaplan–Rosebrough Agreement, instead of simply failing to produce the document, the firm filed objections to the Kaplan Subpoena and then produced documents otherwise responsive at Kaplan's deposition. *See Oregon RSA No. 6, Inc.*, 76 F.3d at 1008 (noting that instead of challenging or opposing discovery, the sanctioned parties "simply failed to comply"). Therefore, Rule 26(g) sanctions are not appropriate against the Dickstein Firm for failing to produce the Kaplan–Rosebrough Agreement.

Turning to BAF's proposed sanctions against Imagine Nation, BAF has pointed to no representation or action taken by Imagine Nation to hinder production of the Kaplan–Rosebrough Agreement. Consequently, insofar as BAF seeks sanctions against Imagine Nation under Rule 26(g) for failing to produce the Kaplan–Rosebrough Agreement, its motion is denied.

#### B. Other Alleged Discovery Abuses.

As above, BAF claims sanctions are appropriate against the Dickstein Firm and Imagine Nation because they have jointly staked the position that Imagine Nation was under no obligation to supplement discovery responses with documents or information generated after Imagine Nation provided responses and objections to BAF's First Request for Production of Documents. BAF complains also of other generic "protracted and dilatory conduct in responding to Plaintiff's proper discovery requests."

Our circuit has upheld Rule 26(g) sanctions where parties' conduct has "clearly added unnecessary delay and expense to the litigation," *e.g., Johnson Int'l Co.,* 19 F.3d at 438–39; *see also id.* at 438 & n. 9 (upholding imposition of Rule 26(g) sanctions (but remanding for amount of sanctions) where claimant under a keyman insurance policy refused to admit at trial that the subject of the policy died in a foreign country of a heart attack even though the claimant asserted the truth of that fact in the insurance claim and despite access to medical records and physicians treating the keyman upon his death; refusal to admit the keyman had suffered heart problems before the policy issued was "not justified" in light of medical records; and refusal to admit the keyman's prescription history at trial where the claimant could have easily verified its authenticity (quotation marks omitted)), and where a party withheld requested information, thus prejudicing another party, *Gen. Motors Corp.,* 965 F.2d at 601 (upholding sanctions under Rule 26(g) and section 1927 where the plaintiff and her attorney "intentionally failed to disclose [the name of a witness] in order to surprise [the defendant] at trial").

 Beginning with Imagine Nation's alleged failure to supplement its discovery responses, the record provides support for the conclusion that Imagine Nation advocated that position not solely to unreasonably delay production of the documents or cause increased expenses to its opponent, *see* Fed. R.Civ.P. 26(g)(2)(B)-(C), but to prevent BAF from carving a window into its recruiting efforts and other competitive activities. While this ended up being a losing position, BAF has not demonstrated it was made for a reason violative of Rule 26(g). As a result, Imagine Nation cannot be sanctioned for taking that position, nor can the Dickstein Firm be sanctioned for advocating it.

And although BAF speaks of other "protracted and dilatory conduct" undertaken in response to BAF "proper discovery requests," it does not specify how either Imagine Nation or the Dickstein Firm violated any standard found in Rule 26(g)(2).[14] As a result, to the extent BAF seeks sanctions for the conduct identified above, *see supra* Part II.C, the same conclusion results.

BAF's motion for sanctions under Federal Rule of Civil Procedure Rule 26(g) must therefore be denied.

#### IV. Propriety of Sanctions Under the Court's Inherent Powers.

Finally, BAF moves for sanctions against Kaplan, Imagine Nation, and the Dickstein Firm under the Court's inherent powers. BAF claims the existence of bad faith conduct on behalf of all of the Resisting Parties by failing to disclose the Kaplan–Rosebrough Agreement as well as advocating and subsequently abandoning the positions discussed above, fused with a purported violation of an Iowa Rule of Professional Conduct by attorneys at the Dickstein Firm renders sanctions appropriate. Sanctions are also appropriate, BAF contends, because various motions have been filed with the purpose of delaying the production of discoverable evidence.[15]

---

**14.** Rule 26(g)(3) permits sanctions only for improper discovery requests, improper responses to discovery requests, or improper objections to discovery requests. *See* Fed.R.Civ.P. 26(g)(2) (providing that an attorney's signature constitutes a certification that "the request, response, or objection" to a request is not violative of Rules 26(g)(2)(A) through (C)); (g)(3) (permitting sanctions if "a certification is made in violation of the rule"). As a result, potential sanctions resulting from something other than objections and re-

sponses to BAF's discovery requests—as Imagine Nation's request for a protective order—are gauged by a different rule. *See* Fed.R.Civ.P. 26 advisory committee's note to 1983 amendment ("Motions relating to discovery are governed by Rule 11.").

**15.** The motions BAF has identified include Motions for Summary Judgment filed by Defendants Craddock, Rader, and Streck. Lacking from BAF's argument is a compelling reason why the

The specific sanctions BAF aspires to obtain include attorneys' fees and costs, as well as an order barring Imagine Nation from arguing at trial that Kaplan was not associated or involved with Reader's Choice before the expiration of the Non–Compete Agreement and prohibiting Imagine Nation from arguing that Imagine Nation is not the successor to Reader's Choice. Alternatively, BAF demands the Court issue a jury instruction permitting the inference that Imagine Nation and Kaplan, through the Dickstein Firm, intentionally withheld the Kaplan–Rosebrough Agreement because that document arguably supports claims that Kaplan was associated with Reader's Choice in violation of the Non–Compete Agreement and that Imagine Nation is Reader's Choice's successor.

## A. Legal Standards.

"It has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" *Chambers*, 501 U.S. at 43, 111 S.Ct. 2123 (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259, (1812)) (alteration in the original). Because of these implied powers, "'Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.'" *Id.* (quoting *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 227, 5 L.Ed. 242 (1821)). This power—founded not in a "rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases—extends 'to control admission to its bar and to discipline attorneys who appear before it.'" *Id.* (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)). Because of their "potency," *id.* at 44, 111 S.Ct. 2123, and because they are "shielded from direct democratic controls," *Roadway Exp., Inc.*, 447 U.S. at 764, 100 S.Ct. 2455; *see Degen v. United States*, 517 U.S. 820, 823–24, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996), "inherent powers must be "exercised with restraint[,] discretion," and "'great caution,'" *Chambers*, 501 U.S. at 44, 111 S.Ct. 2123 (quoting *Ex parte Burr*, 22 U.S. (9 Wheat.) 529, 531, 6 L.Ed. 152 (1824)).

In appropriate cases, a court may select from the menu of sanctions available under its inherent powers the draconian sanction of dismissal to "the 'less severe sanction' of an assessment of attorney's fees," *Chambers*, 501 U.S. at 44–45, 111 S.Ct. 2123 (quoting *Roadway Exp., Inc.*, 447 U.S. at 765, 100 S.Ct. 2455), to an intermediate sanction of the exclusion of evidence or testimony, *see, e.g., Dillon v. Nissan Motor Co.*, 986 F.2d 263, 266–69 (8th Cir.1993); *Bass v. Gen. Motors Corp.*, 150 F.3d 842, 850–51 (8th Cir. 1998), or an adverse inference jury instruction, *Stevenson v. Union P. R.R. Co.*, 354 F.3d 739, 746–50 (8th Cir.2004); *Dillon*, 986 F.2d at 269. There has been much litigation regarding whether bad faith is a prerequisite to the imposition of sanctions under courts' inherent powers. Consolidating authorities reveals different standards apply for different sanctions. Our circuit has explained that while the Supreme Court indicated that "a finding of bad faith 'would have to precede any sanction under the court's inherent powers,'" that requirement does not extend to "every possible disciplinary exercise of the court's inherent power, especially because such an extension would apply the requirement to even the most routine exercises of the inherent power." *Harlan v. Lewis*, 982 F.2d 1255, 1260 (8th Cir.1993) (quoting *Roadway Exp., Inc.*, 447 U.S. at 767, 100 S.Ct. 2455). As a result, the court concluded, the "bad faith" requirement does not apply "to limit the application of monetary sanctions under the inherent power." *Id.* Subsequent decisions reinforce the concept that a finding of bad faith is not required to impose some

Resisting Parties could (or should) be held responsible for the validity *vel non* of motions filed by Defendants against whom BAF has not sought sanctions. As a result, the Motions for Summary Judgment cannot provide the basis of a sanctions award against the Resisting Parties.

The other motions forming the basis of this portion of BAF's Motion for Sanctions are a Motion to Dismiss filed by Imagine Nation and Motions to Strike filed by all Defendants, which are addressed below.

types of sanctions. *E.g., Stevenson,* 354 F.3d at 745; *Dillon,* 986 F.2d at 266–67. For example, the exclusion of an expert's testimony was appropriate where the expert and the attorney retaining the expert "knew or should have known" that a piece of physical evidence would be important in impending litigation before destroying it. *Dillon,* 986 F.2d at 267; *accord Bass,* 150 F.3d at 850–51; *Sylla–Sawdon v. Uniroyal Goodrich Tire Co.,* 47 F.3d 277, 280–81 (8th Cir.1995).

█ Assessment of attorney's fees requires a finding that "a party ' "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." ' " *Chambers,* 501 U.S. at 45–46, 111 S.Ct. 2123 (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), in turn quoting *F.D. Rich Co. v. United States ex rel. Indus. Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974)); *accord United States v. Gonzalez–Lopez,* 403 F.3d at 558, 564 (8th Cir.2005); *Kelly v. Golden,* 352 F.3d 344, 352 (8th Cir. 2003); *Lamb Eng'g & Constr. Co. v. Neb. Pub. Power Dist.,* 103 F.3d 1422, 1436 (8th Cir.1997); *Nielsen v. Trans World Airlines, Inc.,* 95 F.3d 701, 702 (8th Cir.1996); *Dillon,* 986 F.2d at 266; *see also Jaquette v. Black Hawk County,* 710 F.2d 455, 462 (8th Cir. 1983) (collecting authorities). This category has become known as the "bad faith exception" [16] to the so-called American Rule, which typically requires parties to pay their own attorney fees absent a statute or enforceable contract. *See Stevenson,* 354 F.3d at 751; *Kelly,* 352 F.3d at 352; *Lamb Eng'g & Constr. Co.,* 103 F.3d at 1434–35 & nn. 13–14; *Hoover v. Armco, Inc.,* 915 F.2d 355, 357 (8th Cir.1990); *see also Chambers,* 501 U.S. at 45, 111 S.Ct. 2123 (categorizing the exceptions to the American Rule).

Bad faith is present "if a court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled,' " or if "a party 'shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.' " *Chambers,* 501 U.S. at 46, 111 S.Ct. 2123 (quoting *Universal Oil Prods. Co. v. Root Refining Co.,* 328 U.S. 575, 580, 66 S.Ct. 1176, 90 L.Ed. 1447 (1946); *Hutto v. Finney,* 437 U.S. 678, 689 n. 14, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)).[17] For example, sanctions are appropriate if an action is pursued "in bad faith and for no purpose other than to harass and badger" the defendant.

*Nielsen,* 95 F.3d at 702 (quotation marks omitted); *cf. Kelly,* 352 F.3d at 352–53 (affirming sanctions under the bad faith exception where the plaintiff's "pleadings and correspondence were meant to intentionally harm [d]efendant professionally and personally" and where the record reflected "consistent animosity toward" the defendant (quotation marks omitted)). Sanctions are also appropriate where a party intentionally destroys relevant evidence, *see Stevenson,* 354 F.3d at 746–51 (upholding sanctions of an adverse inference jury instruction and attorney's fees but remanding for recalculation after concluding destruction of a recording of communications between a train crew and dispatchers and destruction of track maintenance records was in bad faith in an action against a railway company following a car-train grade crossing collision), or brings a baseless action "which should never have been filed", *Hoover,* 915 F.2d at 357–58 (quotation marks omitted); *see also Actors'*

16. The Supreme Court has recognized two other broad exceptions to the American Rule. Courts may award attorney's fees if a party's litigation efforts directly benefit others. *See Chambers,* 501 U.S. at 45, 111 S.Ct. 2123. A court may also award " 'attorney's fees as a sanction for the ' "willful disobedience of a court order.' " ' " *Id.* (quoting *Alyeska Pipeline Serv. Co.,* 421 U.S. at 258, 95 S.Ct. 1612, in turn quoting *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 718, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967)). BAF does not claim the Dickstein Firm, Imagine Nation, or Kaplan disobeyed a court order, nor does it argue the Resisting Parties' involvement in this litigation directly benefits another. There-

fore, if BAF is to succeed, it must proceed under the bad faith exception.

17. Due process requires that a party against whom sanctions are sought be given notice and an opportunity to be heard before sanctions are imposed under the Court's inherent powers. *See Chambers,* 501 U.S. at 50, 111 S.Ct. 2123; *Plaintiffs' Baycol Steering Committee v. Bayer Corp.,* 419 F.3d 794, 802 (8th Cir.2005). No party addresses whether the hearing held in September 2006 was sufficient to satisfy Kaplan's due process concerns, as Kaplan is not a party to this litigation; but that issue is mooted by this order.

*Equity Ass'n v. Am. Dinner Theatre Inst.,* 802 F.2d 1038, 1043 (8th Cir.1986) ("[B]ad faith [is] evidenced ... by a showing that [a party] intentionally advanced a frivolous contention for an ulterior purpose, such as harassment or delay.").

Cognizant of these standards, the analysis turns to BAF's allegations of bad faith.

## B. Sanctions Against Kaplan.

The analysis begins with BAF's proposed sanctions against Kaplan, not a party to this litigation.

█ BAF relies on *Helmac Products Corp. v. Roth (Plastics) Corp.,* 150 F.R.D. 563 (E.D.Mich.1993), for the proposition that sanctions are appropriate against Kaplan because he is Imagine Nation's sole shareholder and former chairman of Reader's Choice. In *Helmac Products,* the court considered whether to sanction a defendant corporation's owner who ordered the destruction of documents rendering a trial on his corporation's liability impossible. *Helmac Prods. Corp.,* 150 F.R.D. at 565–66. The court pioneered a two-part test to gauge the propriety of imposing sanctions upon the non-party individual, concluding that sanctions were appropriate if the non-party has "a substantial interest in the outcome of the litigation and ... substantially participate[d] in the proceedings in which he interfered." *Id.* at 568. The non-party individual easily satisfied the court's new test. *See id.* at 566 (noting the non-party was "closely tied to the litigation" because he was "the owner of the corporate defendant [and] had a substantial interest in the outcome of the litigation", and "directly interfered with the conduct of trial").

*Helmac Products* is distinguishable in at least two respects. There, discoverable documents were destroyed, rendering a trial on the corporation's liability impossible. *Id.* at 564, 566. Not so here. Second, even though Kaplan was once Reader's Choice's chairman, BAF has not sought sanctions against Reader's Choice. Conversely, in *Helmac Products,* the sanctionable conduct was designed to protect a party, namely, the company the

sanctioned individual owned. *Id.* at 565–66. And while BAF has moved for sanctions against Imagine Nation—the company Kaplan purportedly owns—BAF has demonstrated no connection between the Kaplan–Rosebrough Agreement and its action against Imagine Nation. In *Helmac Products,* the documents destroyed were relevant to the causes of action brought; in fact, the documents' destruction rendered the lawsuit impossible. *See id.* at 565–66. Consequently, assuming Kaplan interfered with production of the Kaplan–Rosebrough Agreement, *Helmac Products* provides little support for the argument that the Court may impose sanctions upon Kaplan.

Even if the Court had wide authority to impose sanctions upon a non-party individual, BAF has pointed to no conduct of Kaplan's that was unreasonable. While Kaplan did not originally disclose the Kaplan–Rosebrough Agreement at his deposition, the disclosure of documents at his deposition was curbed by the statement in Widell's January 18, 2005, letter that Kaplan would produce documents regarding Reader's Choice, which arguably excluded the Kaplan–Rosebrough Agreement. The Court cannot conclude the position that the Kaplan–Rosebrough Agreement did not relate to Reader's Choice, though seemingly wrong, was made in bad faith or was otherwise unreasonable when taken. Additionally, Kaplan freely disclosed the contents of the document at his deposition, undermining the argument that the design of Widell's objection was to ensepulcher the fact that such a business arrangement was discussed.[18] BAF's motion for sanctions against Kaplan by virtue of an exercise of the Court's inherent powers must therefore be denied.

## C. Sanctions Against the Dickstein Firm.

### 1. Alleged Failure to Produce the Kaplan–Rosebrough Agreement.

█ BAF seeks sanctions against the Dickstein Firm under the Court's inherent

---

18. Too much reliance upon Kaplan's willingness to discuss the contents of the Kaplan–Rosebrough Agreement at his deposition is marginally relevant to the consideration of the sanctions issue because discussion *about* a document and *production* of a document pursuant to a subpoena duces tecum to allow more detailed examination are different things entirely.

powers for the firm's role in failing to disclose the Kaplan–Rosebrough Agreement.

A number of recent cases illustrate how courts' inherent powers can be exercised to sanction the failure to disclose or properly represent relevant documents. In *Gas Aggregation Services, Inc. v. Howard Avista Energy, LLC,* an attorney sought to recover fees incurred as a result of his pursuit and perfection of an attorney's lien against a receivable, which was then potentially recoverable by a former client. *Gas Aggregation Servs., Inc. v. Howard Avista Energy, LLC,* 458 F.3d 733, 735–37 (8th Cir.2006). The attorney had represented the former client in a federal action, but after a successful appeal following arbitration of that action, a dispute arose regarding the percentage of the client's award that belonged to the attorney under a fee agreement. *Id.* at 735–36. The receivable was the stake in a state-court interpleader action. *Id.* at 735–36. A state court imposed a lien on the arbitration award and ordered a percentage of the stake be reserved while a second appeal from the arbitration award was pending. *Id.* at 735–36. Ultimately, the former client and the opponent in both the federal arbitration proceeding and the interpleader action settled their disputes. *Id.* at 736. The former client then concealed the existence of the settlement agreement from the attorney, and after the agreement became known to the attorney, the former client misrepresented its terms. *Id.* at 736, 739. The attorney then sought to enforce the lien against the arbitration award in federal court. *Id.* at 736. Citing the bad faith exception, the attorney wished to recover fees incurred to pursue and perfect the lien. *Id.* at 736–37, 739. The Eighth Circuit agreed with the imposition of sanctions, writing that "abundant evidence" of bad faith supported sanctions imposed for the former client's "attempts to conceal the settlement and to misrepresent its terms." *Id.* at 739. Other cases are in accord. *See Heartland Bank v. Heartland Home Fin., Inc.,* 335 F.3d 810, 815–16 (8th Cir.2003) (agreeing with the imposition of sanctions but remanding to redetermine the scope of sanctions imposed where documents were untimely disclosed with the explanation that disclosing party was under no obligation to supplement discovery responses); *Lawrence v. Bowersox,*

297 F.3d 727, 733–34 (8th Cir.2002) (imposition of sanctions appropriate where defendants failed to provide a list of officials involved in alleged civil rights violations of prisoners and failed to produce (and later lost) a videotape of the incident giving rise to the litigation in question); *cf. NLRB v. Superior of Missouri, Inc.,* 351 F.3d 805, 807 n. 1 (8th Cir.2003) (implying sanctions would be appropriate under the court's inherent powers against attorneys misrepresenting material facts, but declining to impose such sanctions *sua sponte*).

Here, there is no specific evidence any member of the Dickstein Firm took a conscious, deliberate step to conceal the Kaplan–Rosebrough Agreement or misrepresent its contents. And the fact remains that the Kaplan–Rosebrough Agreement was actually produced (without Court intervention.). *See Bass,* 150 F.3d at 850–51; *Sylla–Sawdon,* 47 F.3d at 280–81; *Dillon,* 986 F.2d at 267. In fact, once the existence of the document was made known, the Dickstein Firm's attorneys removed it from the firm's safe and voluntarily produced it. Consequently, the Court concludes the Dickstein Firm's attorneys did not engage in bad faith or other misconduct by failing to produce the Kaplan–Rosebrough Agreement. BAF's request for sanctions against the Dickstein Firm arising from any failure to produce the Kaplan–Rosebrough Agreement must therefore be denied.

### 2. Alleged Submission of Baseless Materials.

Next, BAF complains that a Motion to Dismiss filed by Imagine Nation and Motions to Strike filed by all Defendants in this action were submitted by the Dickstein Firm in bad faith and were designed to "hinder [BAF]'s prosecution of [this action] and its defense of Defendants' dispositive motions by withholding key evidence." Specifically, BAF complains of a Motion to Dismiss filed by Imagine Nation and Motions to Strike filed by all Defendants. While each of these motions was ultimately denied, the Court cannot conclude any filing so lacked merit or advocated positions so untenable as to warrant sanctions. This portion of BAF's motion must be denied.

BAF also argues that the Dickstein Firm should be sanctioned for taking, and then abandoning, various arguments during the course of discovery. BAF's concerns have been addressed above. In fact, had the Dickstein Firm not adjusted its positions, it could have very well found itself boxed between advocating a position which ultimately turned out to be untenable and risking the appearance of taking such a position by compromising later on. *See Am. Fed'n of Musicians, Local 2–197 v. St. Louis Symphony Soc'y,* 203 F.3d 1079, 1081 (8th Cir.2000) (agreeing with district court's refusal to impose sanctions where the position advocated was ultimately unsuccessful, but the arguments advanced were neither unreasonable nor implausible); *Actors' Equity Ass'n,* 802 F.2d at 1042 (imposition of attorney's fees where arguments advanced are "frivolous, unreasonable, groundless, or where the party continued to litigate after it clearly became so"). Consequently, this portion of BAF's motion must be denied as well.

### 3. Alleged Violation of Iowa Rule of Professional Conduct 32:3.4.

BAF also argues that the members of the Dickstein Firm violated Iowa Rule of Professional Conduct 32:3.4,[19] which provides that,

[a] lawyer shall not:

(a) unlawfully obstruct another party's access to evidence or unlawfully alter, destroy, or conceal a document or other material having evidentiary value [or] counsel or assist another person to do any such act;

(b) falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law;

. . .

(d) in pretrial procedure, make a frivolous discovery request or fail to make a reasonably diligent effort to comply with

a legally proper discovery request by an opposing party. . . .

Iowa Ct. R. 32:3.4 (2005).[20] One goal of the rule is to combat the alteration, concealment, and destruction of discoverable evidence. *Id.* cmts. 1–2.

Beginning with complaints regarding production of the Kaplan–Rosebrough Agreement, BAF's argument here suffers from many of the same afflictions outlined above. First, BAF has generated no evidence to convincingly suggest the Dickstein Firm was aware the contents of a sealed envelope in the firm's safe included documents potentially responsive to a discovery request. Consequently, BAF has not shown the Dickstein Firm "unlawfully obstruct[ed]" BAF's "access to evidence" or "conceal[ed] a document or other material having evidentiary value." And because the Court must conclude no member of the Dickstein Firm was aware of the document, no attorney there could have "counsel[ed] or assist[ed] another person" to conceal it. As a result, no violations of Rule 32:3.4(a) appear to have occurred with respect to the Kaplan–Rosebrough Agreement.

Second, BAF has not shown a member of the Dickstein Firm "counsel[ed] or assist[ed] a witness to testify falsely." *See id.* R. 32:3.4(b). The record shows that when asked, Kaplan freely discussed the business arrangement memorialized in the Kaplan–Rosebrough Agreement. And at no point did he deny the existence of such an agreement or confess that a Dickstein Firm attorney persuaded him to avoid turning it over or discussing its existence.

Third, because BAF has not shown a member of the Dickstein Firm was aware that the Kaplan–Rosebrough Agreement existed, BAF cannot show that the Firm "fail[ed] to make a reasonably diligent effort to comply with a legally proper discovery request by an opposing party" as required

---

19. If the Court concluded members of the Dickstein Firm have violated an Iowa Rule of Professional Conduct, imposing sanctions would be an appropriate remedy. *See, e.g., Plaintiffs' Baycol Steering Committee,* 419 F.3d at 805–07 (noting sanctions are appropriate where an attorney violates state rules of professional conduct); *accord Greiner v. City of Champlin,* 152 F.3d 787, 789–90 (8th Cir.1998); *Harlan,* 982 F.2d at 1259–60.

20. BAF correctly notes that a prerequisite to membership in this Court's bar is the requirement that each lawyer agree "that in connection with the lawyer's *pro hac vice* representation, the lawyer will submit to and comply with all provisions and requirements of the Iowa Rules of Professional Conduct." LR 83.2(d)(3).

by Rule 32:3.4(d). Attorneys at the Dickstein Firm have demonstrated their belief that not all of the requests in the Kaplan Subpoena were "legally proper." As a result, the scope of documents produced at Kaplan's deposition was limited. While the placement of the envelope in the firm safe was odd, BAF has not convincingly demonstrated that the essential investigation by Dickstein Firm attorneys into the documents in Kaplan's possession regarding the limited scope of documents disclosed was faulty in any way. And, perhaps most importantly, when Cohen became aware that the document might exist at Feigenbaum's deposition, she investigated Feigenbaum's claims in a reasonably timely manner.

Turning to the other alleged "deliberately dilatory conduct" allegedly occurring during discovery, the Court has addressed BAF's concerns above. The fact that the Dickstein Firm withdrew from an arroyo created earlier in this litigation does not mean its construction was sanctionable.

The Court declines BAF's invitation to invoke the Court's inherent powers to sanction the Dickstein Firm, resulting in the denial of this portion of BAF's motion.

### D. Sanctions Against Imagine Nation.

Finally, BAF seeks sanctions under the Court's inherent powers against Imagine Nation for substantially the same conduct outlined above. As noted above, BAF has not demonstrated Imagine Nation had a role in creating, storing, or disclosing the Kaplan–Rosebrough Agreement. BAF's argument thus collapses to complaints about Imagine Nation's advocation of certain positions taken during discovery that Imagine Nation subsequently abandoned. If the Dickstein Firm cannot be sanctioned for advocating certain arguments, which later turned out to be unsuccessful, Imagine Nation cannot be sanctioned for the fact that the arguments were made. BAF's motion for sanctions against Imagine Nation under the Court's inherent powers must therefore be denied.

### V. Conclusion.

As noted at oral argument on this motion, the Court is convinced the circumstances surrounding the envelope placed in the Dickstein Firm safe are peculiar and raise both a reasonable concern for and potential for mischief. However, the Court cannot find on the current record adequate support for the conclusion that any related conduct is subject to sanctions. Likewise, while finding BAF's general concerns about the cumulative conduct during discovery to be reasonably held, the Court is unable to conclude the resistant or aggressive discovery response strategy reached a level of improper motivation sufficient to support an award of sanctions. BAF's Motion for Sanctions (Clerk's No. 92) must be **denied** in its entirety.

**IT IS SO ORDERED.**